# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Matthew Horan
3941 Tarkle Ridge Drive
Kitty Hawk, NC, 27949

&

John Sullivan
1710 Main Avenue
International Falls, MN 56649,

on behalf of themselves and all others similarly
situated,

*Plaintiffs,*

v.

National Cable Satellite Corporation,
400 North Capitol Street, N.W., Suite 650,
Washington, D.C. 20001,

*Defendant.*

Civil Action No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs, individually and on behalf of all other persons similarly situated, make the

following allegations pursuant to the investigation of counsel and based upon information and

belief, except as to allegations specifically pertaining to Plaintiffs and Plaintiffs' counsel, which

are based on personal knowledge.

## I.      NATURE OF THE ACTION

1.       This is a consumer digital privacy class action complaint brought on behalf of all

persons with Facebook accounts who have subscribed to either a C-SPAN account, C-SPAN's

newsletters or for C-SPAN Classroom ("Subscribers") and interacted with videos on the Cable-Satellite Public Affairs Network ("C-SPAN") website c-span.org (the "Website"). C-SPAN is owned and operated by Defendant National Cable Satellite Corporation ("Defendant").

2.      The federal Video Protection Privacy Act ("VPPA") protects consumer privacy by providing for a federal cause of action against "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider", without express consent. 18 U.S.C. § 2710.

3.      Over the past two years, Defendant has systematically transmitted (and continues to transmit today) its Subscribers' personally identifying video viewing information to a third party, Meta Platforms, Inc. ("Facebook"), using a snippet of programming code called the "Meta Pixel," which Defendant installed and configured on its Website.

4.      The information Defendant disclosed (and continues to disclose) to Facebook via the Meta Pixel includes the Subscribers' Facebook ID ("FID"), the title of the specific prerecorded video material, and the URL of the video, that each of its Subscribers accessed on its Website. An FID is a unique sequence of numbers linked to a specific Facebook profile. A Facebook profile, in turn, identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person). Entering "Facebook.com/[FID]" into a web browser returns the Facebook profile of the person to whom the FID corresponds. Thus, the FID identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one person. In the simplest terms, the Meta Pixel installed by Defendant captures and discloses to Facebook information that reveals the specific videos that a particular person accessed on Defendant's Website (hereinafter, "Private Viewing Information").

2

5.     Defendant disclosed and continues to disclose its Subscribers' Private Viewing Information to Facebook without obtaining their consent to these practices.

6.     The VPPA clearly prohibits what Defendant has done. Subsection (a)(1) of the VPPA provides that "the term 'consumer' means any renter, purchaser, or *subscriber of goods or services* from a video tape service provider." (emphasis added). Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent, any "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C.§ 2710(b)(1), damages in the amount of $2,500.00, *see id.* § 2710(c).

7.     Accordingly, on behalf of himself and the putative Class members defined below, Plaintiffs bring this Class Action Complaint against Defendant for intentionally and unlawfully disclosing his Personal Viewing Information to Facebook.

## II.    PARTIES

8.     Plaintiff Matthew Horan is an individual and a resident of the State of North Carolina. Plaintiff Horan is a subscriber of Defendant's Website and has maintained a MyC-SPAN account since approximately 2018.  Since subscribing to the Website, Plaintiff Horan regularly watched prerecorded videos available on the site. At no point during the sign-up process or otherwise did Defendant obtain written consent from Plaintiff Horan to collect his Personal Viewing Information.

9.     At all times relevant hereto, including when registering for a C-SPAN subscription and while watching prerecorded video material from Defendant on its Website, Plaintiff Horan had a Facebook account, a Facebook profile, and an FID associated with such profile.

3

10.     Plaintiff Horan, after subscribing to Defendant's Website, has watched prerecorded videos on Defendant's Website while logged into Facebook during the last two years.

11.     When Plaintiff Horan subscribed to Defendant's Website and viewed prerecorded videos on its Website, Defendant disclosed to Facebook Plaintiff Horan's FID coupled with the specific title of the video he purchased, as well as the URL.

12.     Plaintiff Horan has never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Private Viewing Information to Facebook.

13.     Plaintiff John Sullivan is an individual and a resident of the State of Minnesota. Plaintiff Sullivan is a subscriber of Defendant's Website and has maintained a MyC-SPAN account since approximately 2018.  Since subscribing to the Website, Plaintiff Sullivan regularly watched prerecorded videos available on the site. At no point during the sign-up process or otherwise did Defendant obtain written consent from Plaintiff Sullivan to collect his Personal Viewing Information.

14.     At all times relevant hereto, including when registering for a C-SPAN subscription and while watching prerecorded video material from Defendant on its Website, Plaintiff Sullivan had a Facebook account, a Facebook profile, and an FID associated with such profile.

15.     Plaintiff Sullivan, after subscribing to Defendant's Website, has watched prerecorded videos on Defendant's Website while logged into Facebook during the last two years.

16.     When Plaintiff Sullivan subscribed to Defendant's Website and viewed prerecorded videos on its Website, Defendant disclosed to Facebook Plaintiff Sullivan's FID coupled with the specific title of the video he purchased, as well as the URL.

17.     Plaintiff Sullivan has never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Private Viewing Information to Facebook.

18.    Because Defendant disclosed both Plaintiffs' Private Viewing Information (including their FID, the title of the prerecorded video material watched on Defendant's Website, and the URL of the videos) to Facebook during the applicable statutory period, Defendant violated Plaintiffs' rights under the VPPA and invaded their statutorily conferred interest in keeping such information (which bears on his personal affairs and concerns) private.

19.    Defendant, National Cable Satellite Corporation is a District of Columbia nonprofit corporation with its headquarters and principal place of business at 400 North Capitol Street, N.W., Suite 650, Washington, D.C. 20001. Defendant National Cable Satellite Corporation owns and operates the Website at issue in this litigation, c-span.org.

## III.    JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because it is a civil action arising under a law of the United States: the VPPA,18 U.S.C. § 2710, *et seq*.

21.    Personal jurisdiction and venue are proper because Defendant maintains its headquarters and principal place of business in Washington DC, within this judicial District.

22.    This Court also has jurisdiction under the Class Action Fairness Act because there is diversity in citizenship between the parties, there are 100 or more class members, and the amount in controversy for the proposed Class (defined below) exceeds $5,000,000, excluding interest and costs. 28 U.S.C. § 1332(d)

## IV.    COMMON FACTUAL ALLEGATIONS

### A.    The Video Protection Privacy Act

23.    The VPPA prohibits companies (like Defendant) from knowingly disclosing to third parties (like Facebook) information that personally identifies consumers, (like Plaintiffs) as having viewed particular videos or other audio-visual materials.

24.    Specifically, subject to certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]" 18 U.S.C. § 2710(b)(1). The statute defines a "video tape service provider" as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4). It defines a "consumer" as "a renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). "'[P]ersonally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3)

25.    The VPPA was enacted in 1988 with the specific goal of safeguarding the privacy of personal and familial video rental, purchase, and viewing information. During the law's passage, Senator Paul Simon observed that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes. These records are a window into our loves, likes and dislikes." S. Rep. No. 100-599 at 7-8 (1988). Senator Patrick Leahy, who introduced the legislation, commented that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." *Id* at 8.

26.    Senator Leahy further stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). The deeply personal

and biographical nature of the videos one watches, and the need to protect this information from disclosure, is the inspiration of the statute: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." Id.

27.    While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before. When the Senate Judiciary Committee met in 2014 to consider the legislation in light of technological changes, Senator Leahy emphasized that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud', mobile apps, and other new technologies have revolutionized the availability of Americans' information."[1]

28.    Former Senator Al Franken may have said it best: "If someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."[2]

29.    In this case, however, Defendant deprived Plaintiffs and numerous other similarly situated persons of that right by systematically (and surreptitiously) disclosing their Private Viewing Information to Facebook, without obtaining proper consent from any of them, as explained in detail below.

**B.    Background to Defendant and the Website**

---

[1] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21stcentury.
[2] Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century, franken.senate.gov (Jan. 31, 2012).

30.     National Cable Satellite Corporation is a private nonprofit organization that operates C-SPAN (Cable-Satellite Public Affairs Network) an American cable and satellite television network providing continuous video coverage of government proceedings, public affairs programming, legislative proceedings and other programming via three networks—C-SPAN, C–SPAN2, and C–SPAN3. C-SPAN was established in 1979. C-SPAN operates a popular website where users can access its video content at c-span.org.

31.     As an organization committed to providing video coverage of government affairs, video content is vital to C-SPAN's operations and the central form of content offered on its website. In 2025, the network boasted over 278,231 hours of content available on their website's video library.[3] C-SPAN's website features videos on Congress, the Supreme Court, the White House, key political events, foreign leader addresses, major issues, Book TV, American History TV, educational initiatives, signature series like Washington Journal and Q&A and more. The scale of video delivery on the Website is massive: C-SPAN reports on its video library that its videos have had more than 259,938,057 views.[4] Over the last two years C-SPAN has had more than 45,400,000 unique users visit its site.

32.     On its Website, users can subscribe to a MyC-SPAN Account at no cost, which grants users the ability to *inter alia* create and save clips of C-SPAN video content to their profile page for convenient access; the option to subscribe to email notifications regarding updates on bookmarked video content; access to video recommendations and the ability to download video content.

---

[3] When browsing the video library SPAN reports in the search bar a continuously updating total amount of hours of video content available. *See* https://www.c-span.org/series/browse/ (last visited March 23, 2025).
[4] When accessing the C-SPAN library C-SPAN reports a continuously updating total number of views of its videos in its library. *See* https://www.c-span.org/quick-guide/ (last visited March 23, 2025).

33.     C-SPAN also allows users to subscribe to four distinct digital newsletters relating to topics addressed on its website. C-SPAN offers subscriptions to the following newsletters: (1) *Recap of Today's Top Stories*, a daily summary of key events in Washington with direct coverage; (2) *C-SPAN Program Guide*, a guide providing updates on prime-time and daily schedule highlights; (3) *Saturdays on American History TV*, a weekly newsletter featuring highlights of programs exploring U.S. history; and (4) *Sundays on Book TV*, a weekly newsletter offering previews of featured authors, book festivals, and literary events. Each newsletter is sent directly to the user's inbox and frequently contains multiple links to various videos on the C-SPAN website.

34.     Subscribing to a MyC-SPAN Account or any of the C-SPAN newsletters requires the user to provide their personal information, specifically their email address. All subscribers also provide Defendant with their IP address, which is a unique number assigned to all information technology connected devices, that informs Defendant as to subscribers' city, zip code and general physical location.  Further, when users subscribe to C-SPAN via either a MyC-SPAN Account or any of the C-SPAN newsletters, Defendant discloses this subscription to Facebook, along with the user's personally identifiable FID (if the user is logged into Facebook on their browser).

35.     At no point during the sign-up process for a MyC-SPAN Account or any of the C-SPAN newsletters, did Defendant obtain written consent from subscribers to collect their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," which is a requirement under the VPPA.

**C.     How Defendant Disclosed Subscribers' Personal Viewing Information to Facebook**

*(i)      Background to Facebook and the FID*

36.     Facebook is a social media platform with over 2.9 billion active monthly users. When users sign up on the platform, Facebook's Community Standards require its users to use their real identities, including first and last name. Users are only allowed one account, must use the name they use in "everyday life," and must also provide their birthday and gender.

37.     When a user signs up to Facebook, Facebook assigns them a unique FID number. The FID allows any ordinary person to identify a Facebook user with ease. For example, if the term "Facebook" and a user's FID is entered into a Google search, the person's Facebook profile will appear in the results. Alternatively, a user's profile can be reached by typing "facebook.com/" into the address bar of any browser and appending the FID at the end.

38.     When a user logs into Facebook through a web browser, Facebook places several cookies on the user's device. These cookies are small pieces of code that store information and help identify the user and the websites they visit. One important cookie Facebook uses is the "c_user" cookie, which contains the user's unique FID number. This cookie remains on the user's browser for up to a year after their last visit to Facebook unless they manually log out.

39.     Facebook intentionally designs the c_user cookie to have a long lifespan, allowing the company to track user activity across the web on the same browser, even if the user does not visit Facebook.com again. By using the FID, which is specific to an individual, Facebook can match user activity across different devices and browsers, creating a comprehensive user profile that includes information about the websites the user visited on each device.

40.     This tracking of user movements across the web and devices, enabled by the FID, allows Facebook to collect vast amounts of data on user interests, behavior, and connections. The extensive data collected enables Facebook to generate substantial advertising revenue by offering businesses the ability to target users with specific interests, retarget ads to users who visited their

site without making a purchase, and analyze the types of Facebook users visiting their site by leveraging user demographics, interests, and behaviors on other websites.

*(ii)      The Meta "Pixel"*

41.    To access these services provided by Facebook, organizations like the National Cable Satellite Corporation install the Meta "pixel" on its website. Also known as "web beacons," pixels are small, *invisible* images that a browser downloads like any other image on a website. Meta's pixel facilitates its tracking and data collection process, allowing Facebook to gather information about user behavior on the business's website and connect it to the user's Facebook profile using the c_user cookie and FID.

42.    When a user visits a web page containing the Meta Pixel, the pixel contacts the Facebook ad server. The pixel can be programmed by the business to send information to Facebook when users perform specific actions on the website, such as adding an item to their shopping cart, clicking a particular button, or watching a video. If the user has an active c_user cookie on their browser, Facebook receives the event information along with the user's FID, effectively linking the user's specific actions on the website to their Facebook profile. Without the pixel installed, the user's actions on the website would not be communicated to Facebook.

*(iii)     Defendant Used the Meta Pixel to Send Digital Subscriber's Personal Viewing Information to Facebook*

43.    National Cable Satellite Corporation installed the Meta Pixel on its Website and on the individual pages on its Website.

44.    Defendant configured the pixel on the Website to send specific data to Facebook. Specifically, when consumers watch prerecorded videos on Defendant's Website, the Website executes a GET request to Facebook's tracking URL "https://www.facebook.com/tr" and sends it

various querystring parameters and cookie values which disclose the name of the videos watched by the consumer, the URLs of the webpages hosting the videos, and the consumer's FID, among other information. The transmitted data permits Facebook to identify the specific videos that an individual has watched.

45.     To illustrate the types of information transmitted to Facebook when a subscriber accesses a video, consider, by way of example, the transmission that occurs when a subscriber views the video on the C-SPAN website titled "Gov. Walz on Harris' Proposed Policies to Help Native and Tribal Communities." When a subscriber views this video, the data transmitted to Facebook includes the exact video title ("Gov. Walz on Harris' Proposed Policies to Help Native and Tribal Communities") as well as the associated URL: https://www.c-span.org/clip/campaign-2024/gov-walz-on-harris-proposed-policies-to-help-native-and-tribal-communities/5138650. The transmission also includes information about a user's interaction with the video, such as whether it is paused. Additionally, the communication includes a user's FID. This example reflects the type of Personal Viewing Information that is transmitted to Facebook each time a subscriber accesses any of the tens of thousands of videos available on the C-SPAN website.

46.     The data Defendant shared with Facebook was not anonymized or de-identified. Instead, it was linked to unique identifiers that tracked specific Facebook users. Crucially, Facebook received the Personal Viewing Information together (including the FID) as a single communication, enabling a direct connection between the user and their viewing activity. In this way, National Cable Satellite Corporation's disclosures of Personal Viewing Information to Facebook allows Facebook to develop, supplement, or cross-reference existing data on its own detailed profiles about its users.

47.     Since installing the Meta Pixel on its website, Defendant knew that the Meta Pixel disclosed Personal Viewing Information to Facebook. Defendant intentionally programmed its Website to include the Meta Pixel code in order to take advantage of the targeted advertising and other informational and analytical services offered by Facebook. The Meta Pixel code systematically transmits to Facebook the FID of each person with a Facebook account who watches prerecorded video material on its Website, along with the specific title of the prerecorded video material that the subscriber watched on Defendant's website.

48.     With only a person's FID and the title of the prerecorded video material (or URL where such material is available) that the subscriber watched on Defendant's Website—all of which Defendant knowingly provides to Facebook on a systematic basis—any ordinary person could learn the identity of the person to whom the FID corresponds and the title of the specific prerecorded video material that the subscriber watched. This can be accomplished simply by accessing the URL www.facebook.com/[insert the person's FID here]/.

49.     Defendant's practices of disclosing the Private Viewing Information of its subscribers to Facebook continued unabated for the duration of the two-year period preceding the filing of this action. At all times relevant hereto, whenever Plaintiffs or any other person watched prerecorded video material from Defendant on its Website, Defendant disclosed to Facebook *inter alia* the specific title of the video material that was watched (including the URL of the material), along with the FID of the person who watched it (which, as discussed above, uniquely identified the person).

50.     At all times relevant hereto, Defendant knew that the Meta Pixel was disclosing its subscribers' Private Viewing Information to Facebook.

51.     Defendant did not obtain prior written consent from its digital subscribers before disclosing their Personal Viewing Information to Facebook. As a result, National Cable Satellite Corporation's newsletter subscribers remained unaware that their Personal Viewing Information and other sensitive data was being shared with Facebook.

52.     By intentionally disclosing to Facebook each of the Plaintiffs' and its other subscribers' FIDs together with the specific video material that they watched, without obtaining their consent to these practices, Defendant knowingly violated the VPPA.

**D.     Defendant has no justification for sharing user's Personal Viewing Information with Facebook**

*(i)     Disclosing Personal Viewing Information is not necessary*

53.     While websites might find it beneficial to integrate Facebook tracking pixels, Defendant does not need to use tracking pixels to operate its Website and manage website or newsletter subscriptions. The Meta Pixel is used on the Website for the sole purpose of enriching Defendant and Facebook.

54.     Nor is Defendant obligated to disclose Personal Viewing Information to Facebook. In fact, Facebook itself prohibits the disclosure of such information without first complying with the specific requirements of the VPPA and relevant state laws. Therefore, National Cable Satellite Corporation's disclosure of Personal Viewing Information to Facebook is not only unnecessary but also goes against Facebook's own policies.

*(ii)    The Website's privacy policy fails to obtain proper consent from subscriber*

55.     National Cable Satellite Corporation through its C-SPAN website, fails to comply with the VPPA by neglecting to properly notify users and obtain their written consent before collecting their private viewing information. The VPPA mandates that such consent be written

and must be obtained through a form that is "distinct and separate from any form setting forth other legal or financial obligations of the consumer." Defendant does not adhere to this requirement.

56.     While Defendant's privacy policy, as linked on the C-SPAN website, states that C-SPAN incorporates third-party services, including pixels, to display advertisements on its webpages, it fails to disclose its specific use of the Meta Pixel.[5] Moreover, the Defendant's privacy policy on its Website does not specifically disclose that the C-SPAN shares subscribers' private, protected and personally identifiable Personal Viewing Information with Facebook and that this information, via subscribers' FID, is linked directly to their personal Facebook accounts.

57.     More critically, Defendant's failure to obtain MyC-SPAN and newsletter subscribers' written consent constitutes a direct violation of the VPPA.

58.     In addition, Defendant also fails to bring its privacy policy to the attention of subscribers to all four of its digital newsletters. While users who subscribe to a MyC-SPAN account are required to accept C-SPAN's Privacy Policy and Terms of Service, newsletter subscribers are not made aware of C-SPAN's Privacy Policy or Terms of Service. The Privacy Policy and Terms of Service are entirely absent from all newsletters themselves and to access the Privacy Policy, newsletter subscribers must scroll to the bottom of a page on the Website to locate and click on a small-text link labeled "Privacy Policy."

## V.     PLAINTIFFS' PERSONAL ALLEGATIONS

59.     Plaintiff Horan has been a subscriber of C-SPAN since approximately 2018.

---

[5] *See* https://www.c-span.org/about/privacy/ (last visited March 23, 2025).

60.     When subscribing to the C-SPAN Website, Plaintiff Horan provided Defendant with, among other information, his email address and IP address (which informs Defendant as to the city and zip code he resides in as well as his general, physical location).

61.     Plaintiff Horan has periodically watched videos on C-SPAN.

62.     Plaintiff Horan has had a Facebook account since approximately 2009. Plaintiff has been logged into his Facebook account on the same browser which he uses to access the C-SPAN Website, including when he has watched videos.

63.     Plaintiff Horan has never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook. Plaintiff Horan has never been provided any written notice that Defendant discloses its digital subscribers' Personal Viewing Information, or any means of opting out of such disclosures of his Personal Viewing Information. Defendant nonetheless disclosed Plaintiff's Personal Viewing Information to Facebook.

64.     Plaintiff Sullivan has been a subscriber of C-SPAN since approximately 2018.

65.     When subscribing to the C-SPAN Website, Plaintiff Sullivan provided Defendant with, among other information, his email address and IP address (which informs Defendant as to the city and zip code he resides in as well as his general, physical location).

66.     Plaintiff Sullivan has periodically watched videos on C-SPAN.

67.     Plaintiff Sullivan has had a Facebook account since at least 2018. Plaintiff Sullivan has been logged into his Facebook account on the same browser which he uses to access the C-SPAN Website, including when he has watched videos.

68.    Plaintiff Sullivan has never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook. Plaintiff Sullivan has never been provided any written notice that Defendant discloses its digital subscribers' Personal Viewing Information, or any means of opting out of such disclosures of his Personal Viewing Information. Defendant nonetheless disclosed Plaintiff's Personal Viewing Information to Facebook.

## VI.    CLASS ACTION ALLEGATIONS

69.    Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action on behalf of the following class (the "Class"):

> All persons in the United States with a subscription to the "c-span.org" Website owned and/or operated by Defendant that, within the statute of limitations, had their Personal Viewing Information disclosed to Facebook by Defendant.

70.     *Numerosity.* Members of the Class are so numerous that joinder of all class members is impractical. Given the popularity of the Website, the number of persons in the class is estimated to be in the thousands.

71.    *Commonality and predominance.* A well-defined community of interest exists in the questions of law and fact involved in this case. Questions of law and fact common to the members of the class that predominate over questions affecting only individual Class members include:

> (a)    Whether Defendant knowingly disclosed Class members' Personal Viewing Information to Facebook;

(b)     Whether the information disclosed to Facebook concerning Class members' Personal Viewing Information constitutes personally identifiable information under the VPPA;

(c)     Whether Defendant's disclosure of Class members' Personal Viewing Information to Facebook was knowing under the VPPA;

(d)     Whether Class members consented to Defendant's disclosure of their Personal Viewing Information to Facebook in the manner required by 18 U.S.C. § 2710(b)(2)(B); and

(e)     Whether the Class is entitled to damages as a result of Defendant's conduct.

72.     *Typicality.* Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, are newsletter subscribers who watched videos on the Website and had their Personal Viewing Information collected and disclosed to Facebook by Defendant.

73.     *Adequacy.* Plaintiffs will adequately safeguard the interests of the Class members, as Plaintiffs' interests align with, and do not contradict, those of the Class. Plaintiffs' counsel has experience in handling class action litigation, including in the area of consumer digital privacy.

74.     *Superiority.* A class action is the most effective, efficient and fair way to resolve this dispute, as individual litigation by all Class members is impractical and would overburden the court system. It would also risk inconsistent judgments and increase delays and expenses for all involved parties. In contrast, proceeding as a class action presents few management challenges, conserves resources, and protects the rights of each Class member. Plaintiffs expect no difficulties in managing this case as a class action.

18

## VII.    CAUSE OF ACTION

**Violation of the Video Privacy Protection Act 18 U.S.C. § 2710, *et seq.***

Plaintiffs incorporate the above paragraphs by reference and say—

75.    Defendant is a "video tape service provider" because it has created, hosted and delivered thousands of videos on its Website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials". 18 U.S.C. §2710(a)(4).

76.    Plaintiffs and members of the Class are "consumers" because they provided personal information to Defendant in order to sign up for a MyC-SPAN account or C-SPAN newsletter on the Website. This makes them a "subscriber" and therefore a "consumer" under the VPPA. 18 U.S.C. § 2710(a)(1).

77.    Plaintiffs' and Class members' Personal Viewing Information — including their FIDs, the title of videos watched, and the video URLs — is "personally identifiable information" because it identifies each Plaintiff and Class member to Facebook as an individual who watched videos on the C-SPAN, including the specific video materials requested from the Website. 18 U.S.C. §2710(a)(3).

78.    Plaintiffs and the members of the Class requested or obtained specific video materials from the Defendant by watching or viewing videos on the Defendant's C-SPAN.

79.    Defendant knowingly disclosed Plaintiffs' and Class members' Personal Viewing Information to a third party, Facebook, using the Meta Pixel. The disclosure occurred knowingly because Defendant chose, programmed and intended for Facebook to receive the Personal Viewing Information, and also used that data to build audiences on Facebook and retarget them for their advertising campaigns.

80.     By disclosing Plaintiffs' and the Class members' Personal Viewing Information to Facebook, Defendant violated Plaintiffs' and the Class members' statutorily protected right to privacy in their video-watching habits. 18 U.S.C. § 2710(c).

81.     Defendant did not obtain "informed, written consent" for the disclosure to Facebook of Plaintiffs' and Class members' Personal Viewing Information in accordance with the requirements in 18 U.S.C. §2710(b)(2)(B).

82.     Defendant's disclosure to Facebook of Plaintiffs' and other Class members' Personal Viewing Information did not occur within the "ordinary course of business". The disclosures to Facebook were not incident to "debt collection activities, order fulfilment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2), (b)(2)(E).

83.     As a result of the above violations, Defendant is liable to Plaintiffs and other Class members for actual damages related to their loss of privacy, but not less than "liquidated damages in an amount of $2,500 per plaintiff." 18 U.S.C. § 2710(c)(2)(A). Under the VPPA, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## VIII.   PRAYER FOR RELIEF

84.     Accordingly, Plaintiffs, on behalf of themselves and the proposed Class, respectfully request that this Court grant judgment against Defendant as follows:

(a)     an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

(b)    an order declaring that Defendant's conduct violates the VPPA, under 18 U.S.C. § 2710(c)(2)(D);

(c)    liquidated damages of $2,500 to Plaintiffs and each Class member, under 18 U.S.C. § 2710(c)(2)(A);

(d)    punitive damages, as warranted, in an amount to be determined at trial, under 18 U.S.C. § 2710(c)(2)(B);

(e)    prejudgment interest on all amounts awarded;

(f)    an order of restitution and all other forms of equitable monetary relief;

(g)    injunctive relief as pleaded or as the Court may deem proper; and

(h)    an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit, under 18 U.S.C. § 2710(c)(2)(C).

## IX.   JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Dated: 04/14/2025                    Respectfully submitted,

                                     /s/ Stan M. Doerrer
                                     Stan M. Doerrer (DC Bar # 502496)
                                     **LAW OFFICE OF**
                                     **STAN M. DOERRER PLLC**
                                     950 N. Washington Street
                                     Alexandria, VA. 22314
                                     Tel: 703-348-4646
                                     Fax: 703-348-0048
                                     stan@doerrerlaw.com

                                     Katrina Carroll, Esq.*
                                     **CARROLL SHAMBERG LLC**
                                     111 West Washington Street Suite 1240
                                     Chicago, IL 60602
                                     Office: 872-215-6205
                                     Mobile: 847-848-1384
                                     katrina@csclassactions.com

                                     *Pro Hac Vice Application Forthcoming*

                                     *Counsel for Plaintiffs*