**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MATTHEW HORAN, *et al.,*<br>*Plaintiffs,*<br>v.<br>NATIONAL CABLE SATELLITE CORP.,<br>*Defendant.* | Civil Action No. 25-1114 (BAH)<br><br>Judge Beryl A. Howell |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiffs Matthew Horan and John Sullivan ("Plaintiffs") submit this Memorandum of Points and Authorities in opposition to the Motion to Dismiss filed by Defendant National Cable Satellite Corp. ("Motion" or "Mot.") (hereinafter "Defendant" or "C-SPAN") and state as follows:

## I. INTRODUCTION

Plaintiffs bring this action under the Video Privacy Protection Act ("VPPA") to remedy C-SPAN's unlawful disclosure of their personally identifiable video viewing information to Meta Platforms, Inc. ("Facebook"). Through its installation and configuration of the Meta Pixel on its website, C-SPAN knowingly transmitted information including Plaintiffs' Facebook IDs ("FID"), the specific titles of prerecorded videos viewed, and associated URLs to Facebook—data that directly identified Plaintiffs' video-watching behavior without their consent. This disclosure violated Plaintiffs' statutorily protected privacy rights under the VPPA.

C-SPAN's motion to dismiss relies on narrow interpretations of the statute that are contrary to both the plain text of the VPPA and the overwhelming weight of judicial authority. First, Plaintiffs are "consumers" under the VPPA. Their MyC-SPAN subscriptions were directly tied to Defendant's provision of video content, affording them premium features such as the ability to save clips, subscribe to notifications, and access video recommendations. Unlike in cases where courts found no consumer

relationship because the subscription was wholly unrelated to video content, Plaintiffs' subscriptions were expressly connected to C-SPAN's audiovisual materials and therefore satisfy the statutory definition.

Second, Plaintiffs adequately allege that C-SPAN knowingly disclosed their personally identifiable information ("PII"). Numerous courts addressing Facebook Pixel cases have held that allegations like these—where the defendant intentionally installed and programmed the Pixel to transmit FIDs and video-viewing data—are sufficient to plead knowing disclosure.

Finally, Plaintiffs plausibly allege that the information disclosed qualifies as PII under any recognized standard. Courts nationwide have concluded that the combination of a FID and specific video titles or URLs readily identifies an individual and their viewing behavior. While C-SPAN urges adoption of the Second Circuit's recent outlier decision in *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 51-54 (2d Cir. 2025), every other court outside that Circuit has rejected such a restrictive approach.

Accordingly, Plaintiffs respectfully request that the Court deny C-SPAN's motion to dismiss in its entirety.

## II. RELEVANT FACTUAL BACKGROUND

Plaintiffs bring this action on behalf of themselves and all others similarly situated, alleging that Defendant, which owns and operates the C-SPAN website (c-span.org) (the "Website"), unlawfully disclosed their private video viewing information to Facebook without their consent, in violation of the VPPA. Class Action Complaint, at ¶¶ 1–7, 19.[1]

Plaintiffs allege that Defendant installed and configured the Meta Pixel on its Website, which systematically transmitted to Facebook, *inter alia*, users' FID, the titles of the specific prerecorded videos viewed, and the URLs of those videos. ¶¶ 3–4, 43–45. An FID is a unique identifier tied to a specific Facebook profile, which, in turn, identifies a particular individual. Thus, the Meta Pixel enabled Facebook to match video viewing activity on C-SPAN's website with individual users'

[1] All citations to "¶" herein are to Plaintiffs' Class Action Complaint, unless otherwise specified.

Facebook profiles. ¶¶ 4, 36–39, 48. Defendant disclosed this "Private Viewing Information" knowingly, without obtaining Plaintiffs' or other subscribers' informed, written consent in the form required by the VPPA. ¶¶ 5, 35, 51–52, 55–57.

Plaintiff Horan, a resident of North Carolina, has maintained a MyC-SPAN account since approximately 2018 and regularly watched prerecorded videos on C-SPAN's Website while logged into Facebook. During this time, Defendant allegedly disclosed his FID, along with the titles and URLs of videos he viewed, to Facebook without his consent. ¶¶ 8–12, 59–63. Plaintiff Sullivan, a resident of Minnesota, also has maintained a MyC-SPAN account since approximately 2018, watched prerecorded videos on the website while logged into Facebook, and likewise had his FID, video titles, and URLs disclosed to Facebook without his consent. ¶¶ 13–17, 64–68.

Plaintiffs' MyC-SPAN subscriptions, which required them to provide their email address to Defendant, gave them access to premium features in Defendant's video content, including the ability to create and save clips of C-SPAN video content to their profile page for convenient access, the option to subscribe to email notifications regarding updates on bookmarked video content, access to video recommendations and the ability to download video content. ¶¶ 32, 34, 60, 65.

Defendant used the Meta Pixel to enhance its advertising capabilities by enabling Facebook to track subscribers' video viewing behavior and target them with advertising. Defendant's disclosures were unnecessary to the functioning of its Website or newsletters, and in fact violated even Facebook's own policies prohibiting such practices. ¶¶ 47, 49–50, 53–54.

As a result of Defendant's conduct, Plaintiffs allege that their statutorily protected privacy interests under the VPPA were violated, and they seek statutory liquidated damages of $2,500 per violation, along with other relief. ¶¶ 18, 75–83.

## III. ARGUMENT

### A. Plaintiffs Have Plausibly Alleged They are "Consumers" Under the VPPA.

In *Pileggi v. Wash. Newspaper Publ'g Co., LLC*, No. 24-7022, 2025 WL 2319550 (D.C. Cir.

Aug. 12, 2025) (" *Pileggi II*"), the D.C. Circuit concluded that the plaintiff was not a "consumer" as defined in the VPPA because "she did not subscribe to a video or similar audio-visual good or service." *Id.* at *8. In doing so, the appellate court rejected the concept that a person who purchases *any* good or service from a defendant could later be considered a "consumer" of that defendant's products under the VPPA; instead, while leaving the issue open, the court concluded that there must be some connection between the individual's subscription to the defendant's video provision services and the underlying cause of action. *Id.* at *12 ("Because the newsletter in no way connected Ms. Pileggi to a relevant video, we have no opportunity to address what kinds of connections are required between a product like a newsletter and a video for a cause of action under the Video Privacy Act to arise").

Not so here, where Plaintiffs have pled that their MyC-SPAN account subscriptions are directly connected to C-SPAN's provision of audio/visual materials. *See Pileggi II*, at *8 ("Putting the words together, a 'consumer' of a 'video tape service provider' is someone who 'rent[s], purchase[s], or subscribe[s]' to the 'good or service' that a 'video tape service provider' offers—that is, 'video cassette tapes or similar audio visual materials'") (citing 18 U.S.C. § 2710(a)).

Specifically, Plaintiffs allege that, through their MyC-Span accounts they were able to access certain unique features related to Defendant's video materials, including the ability to create and save clips of C-SPAN video content to their profile page for convenient access; the option to subscribe to email notifications regarding updates on bookmarked video content; access to video recommendations and the ability to download video content. ¶ 32. Thus, unlike in *Pileggi II* where the plaintiff's newsletter subscription had nothing to do with the videos she watched on the defendant's website, here Plaintiffs' subscriptions expressly related to, and granted Plaintiffs premium features for, viewing C-SPAN's digital video content itself. *Id; see Pileggi v. Wash. Newspaper Publ'g Co., LLC*, 2024 WL 324121, at *10 (D.D.C. Jan. 29, 2024) ("*Pileggi I*") ("While plaintiff alleges that she subscribed to Washington Examiner's newsletter—which provides audio visual content but without use of the website tracking tool Meta Pixel—nowhere does she allege that this subscription had *any*

*connection to the audio-visual content* she accessed on the separate Washington Examiner website") (emphasis added).

In a case *Pileggi I* cites, *Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 162 (S.D.N.Y. 2023), for example, the court found that the plaintiff was not a consumer under the VPPA because, first "there [was] no connection between the emails from Today.com for which Golden signed up and the website and mobile app through which the FAC alleges she accessed the videos at issue," and, second, "Golden's receipt of Today.com emails, and her use of its mobile app, did not provide her with any video viewing benefits beyond those accessible to any member of the public who had accessed the Today.com website or app." Plaintiffs here satisfy both of these tests: their MyC-SPAN subscriptions were directly connected to the video content on the Website and provided them numerous benefits above and beyond what a member of the public watching a video on the Website would have. *See Carter v. Scripps Networks, LLC*, 670 F. Supp. 3d 90, 99 (S.D.N.Y. 2023) ("The newsletters may entice or encourage recipients to view hgtv.com videos, but there is no assertion that a newsletter subscription was required to access those videos, functioned as a login, or *gave newsletter subscribers extra benefits as viewers*") (emphasis added).

Defendant's argument that "Plaintiffs do not allege that there is a link between the MyC-SPAN account and access to the audio-visual content on the C-SPAN website" (Mot. at 8), is therefore incorrect. While true that the subscription did not grant Plaintiffs *exclusive* access to otherwise restricted video content, such exclusive access is not required. *Pileggi I*, at *10 (interpreting the term "subscriber" to involve "some type of commitment, relationship, or association (financial or otherwise) between a person and an entity" and "identifying a non-exclusive list of factors indicative of 'subscriber' status: 'payment, registration, commitment, delivery, expressed association, ***and/or*** access to restricted content'") (emphasis added) (citation omitted). By providing their emails and IP addresses to C-Span in order to sign up for their MyC-SPAN accounts (¶¶ 34, 60, 65), which included extra benefits linked to Defendant's videos, Plaintiffs registered, committed to, and expressed

association with Defendant's audio/visual services and therefore qualify as consumers under the VPPA. Though Defendant notes that Plaintiffs did not pay for their subscriptions, the *Pileggi I* court recognized, relying on decisions from the First and Eleventh Circuits, that "one can be a 'subscriber' without making a monetary payment." *Pileggi I*, at *9. This factor is therefore not dispositive and does not and should not preclude Plaintiffs from being subscribers in light of the other facts demonstrating that their MyC-SPAN accounts rendered them "consumers" under the VPPA.

**B. Plaintiffs Adequately Alleged C-SPAN's Knowing Disclosure of their PII to Meta.**

To allege a violation of the VPPA, a plaintiff must allege facts suggesting that "a video tape service prover knowingly disclosed, to any person, personally identifiable information concerning any consumer of such provider." *Adams v. Am's. Test Kitchen, LP*, 680 F. Supp. 3d 31, 43 (D. Mass. 2023) (citation omitted). When raised on a motion to dismiss, the court "accepts as true all the factual allegations in the complaint and construe[s] all reasonable inferences in favor of the plaintiff." *Id*.

**1. Plaintiffs allege that C-SPAN disclosed their FID to Meta.**

Contrary to C-SPAN's contention, Plaintiffs repeatedly allege that C-SPAN disclosed their FID to Meta. *See, e.g.* ¶4 ("The information Defendant disclosed (and continues to disclose) to Facebook via the Meta Pixel includes the Subscribers' Facebook ID"); ¶49 ("Defendant disclosed to Facebook [...] the FID of the person who watched" the video); ¶50. Even C-SPAN's lone, cherry-picked citation to the Complaint is titled "How *Defendant* Disclosed Subscribers' Personal Viewing Information to Facebook." Comp., Sec. IV(C) (emphasis added). C-SPAN cannot dispute Plaintiffs' allegations at this stage. *See Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1338, 1342 (N.D. Ga. 2022) (accepting allegation that defendant "disclosed her Facebook ID").

C-SPAN's argument otherwise (Mot. 9-10) is unsupported by any other Meta pixel case and ignores that *C-SPAN* itself installed the pixel on its Website and "configured [it...] to send specific data to Facebook", including "the consumer's FID." ¶¶43-44. Whether the pixel that C-Span installed and configured creates the FID before sending it to Facebook is inconsequential. C-SPAN's lone

citation to *Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017), which did not deal with the Meta pixel or FIDs, is irrelevant to this discussion.[2]

**2. Plaintiffs allege C-SPAN's knowing disclosure of their FID to Meta.**

Plaintiffs also explicitly allege that C-SPAN knowingly disclosed their PII, including their FID, to Meta. Specifically, Plaintiffs allege that C-SPAN "intentionally programmed its Website to include the Meta Pixel code in order to take advantage of the targeted advertising and other informational and analytical services offered by Facebook." ¶47; *See also* ¶¶43-44; 50 ("Defendant knew that the Meta Pixel was disclosing its subscribers' Private Viewing Information to Facebook."); 52; 79 ("Defendant chose, programmed and intended for Facebook to receive the Personal Viewing Information, and also used that data to build audiences on Facebook and retarget them for their advertising campaigns.").

Most decisions examining this issue in Meta pixel cases— if not *every* decision— have held such allegations are sufficient to state a VPPA claim. *See Adams*, 680 F. Supp. 3d at 43 (finding allegations that defendant installed and programmed Meta's pixel on its website and knowingly used it to disclose PII to Facebook sufficient to show knowing disclosure); *Mendoza v. Ceasars Entertainment, Inc.*, 2024 WL 2316544, at *4-5 (D.N.J. May 22, 2024) (allegations that the defendant incorporated the Meta pixel into the code of its website and used the application to transit FIDs and website activity to Facebook sufficient to show knowing disclosure, and collecting authority); *Aldana v. GameStop, Inc.*, 2024 WL 708589, at *9 (S.D.N.Y. Feb. 21, 2024) (allegation that GameStop "integrated or installed the Facebook Tracking Pixel into its website ... is sufficient to allege that [it] acted 'knowingly'"). *Harris v. Public Broad. Serv.*, 662 F.Supp.3d 1327, 1336-37 (N.D. Ga. 2023) ("If Defendant installed the Facebook pixel knowing it transmits that information, the knowledge element of the VPPA is satisfied."); *Goldstein v. Fandango Media, LLC*, 2023 WL 3025111, at *4

[2] *Eichenberger* acknowledged that a "Facebook link or an email address may very well readily enable an "ordinary person" to identify an individual. *Id*. at 986.

(S.D. Fla. Mar. 7, 2023) (holding that "Plaintiffs have alleged sufficient facts to support their assertion that Defendant's conduct was done knowingly"); *Belozerov v. Gannett Co.*, 646 F. Supp. 3d 310, 315 (D. Mass. 2022) (finding that plaintiff "has plausibly pled that Gannett's disclosure of users' PII was made knowingly"); *Czarnionka v. Epoch Times Ass'n, Inc.*, 2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022) (holding that complaint alleged that defendant's "disclosures were made knowingly, as [Defendant] programmed the Facebook Pixel into its website code, knowing that Facebook would receive video titles and the subscriber's FID when a subscriber watched a video"); *Lebakken*, 640 F. Supp. 3d at 1342-43 (finding that plaintiff "does plausibly allege WebMD's conscious transmission of its consumers' private information"); *Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (finding that plaintiff had adequately alleged knowing disclosure).

Without offering any factual distinctions between this long, consistent line of cases and this one, C-SPAN suggests, without any reliance on statutory language, that it must know that Plaintiffs specifically were registered Facebook users. No case has imposed such a granular reading of knowingly. Instead, C-SPAN's two cases are far afield and do not deal with the Meta's pixel at issue here. The "disclosure" of personal viewing information in *Mollett v. Netflix, Inc.*, 2012 WL 3731542 (N.D. Cal. Aug. 17, 2012) involved the mere *possibility* that someone could look over a subscriber's shoulder to see the subscriber's Netflix viewing history on a television screen, and *In re Hulu Privacy Litig.*, 86 F. Supp. 3d 1090 (N.D. Cal. 2015), which was a summary judgment decision dealing with a Facebook "Like" button on Hulu's website, acknowledged that "knowingly" meant the "consciousness of transmitting the private information." *See also Mendoza*, 2024 WL 2316544, at *4, n.2 (declining to follow *In re Hulu* in case involving Meta's pixel because *In re Hulu* dealt with different technology); *Lebakken*, 640 F. Supp. 3d at 1342-43 (declining to follow *In re Hulu* and accepting allegations of conscious transmission at pleading stage); *Li v. Georges Media Group LLC*, 2023 WL 7280519, at *4 (E.D. La. Nov. 3, 2023) (noting that, unlike in *In re Hulu*, "many other district courts have simply found that where a complaint alleges knowing disclosure under the VPPA, a motion to dismiss will

not succeed").

### 3. Plaintiffs allege C-SPAN's disclosure of their PII.

Under 18 U.S.C. § 2710(a)(3), PII "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." Plaintiffs have alleged just that, including that whenever a subscriber views a video on the Website, the data transmitted to Facebook includes *the exact video title* (e.g., "Gov. Walz on Harris' Proposed Policies to Help Native and Tribal Communities") as well as the associated URL: (e.g., https://www.c-span.org/clip/campaign-2024/gov-walz-on-harris-proposed-policies-to-help-native-and-tribal-communities/5138650). ¶45. The transmission also includes a user's FID. ¶45. "With only a person's FID and the title of the prerecorded video material (or URL where such material is available) [...] any ordinary person could learn the identity of the person to whom the FID corresponds. This can be accomplished simply by accessing the URL www.facebook.com/[insert the person's FID here]/." ¶¶4, 48. Importantly, the data shared was not anonymized or de-identified (¶46), and Facebook requires its users to use their real identities, including first and last name (¶36). Users are only allowed one account, must use the name they use in "everyday life," and must also provide their birthday and gender. ¶36. In this way, Facebook profiles and their FIDs identify a person more precisely than a name. ¶4.[3]

#### i. Applicable Standards

The Circuits are split between two views of what type of PII is protected under the VPPA. The First Circuit holds that the disclosure of PII is subject to the VPPA if the disclosed information is "reasonably and foreseeably likely to reveal which" video content the plaintiff obtained. *Yershov v.*

[3] Given these allegations and all inferences drawn in their favor, *Smith v. Trinity Broad. of Tex., Inc.*, 2024 WL 4394557 (C.D. Cal. Sep. 27, 2024), which no other court has followed, is inapposite. Nor can C-SPAN rely on extrinsic documents—ie, an alleged Facebook "Help Center" websites (Mot. 13)— to contest factual allegations on a motion dismiss. Regardless, Plaintiffs allege that an ordinary person *could* use a FID to identify a person by simply entering the FID into a web browser, as described *infra*. *See In re: Nickolodeon Consumer Priv. Litig.*, 827 F.3d 262, 283 (3rd Cir 2016) (recognizing "even a numeric identifier might qualify as personally identifiable information").

*Gannet Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016). As C-SPAN does not dispute, courts routinely find that Meta's pixel-based disclosures of an FID and URL indicating the video content obtained are PII under this standard. *See, e.g. Adams*, 680 F. Supp. 3d at 41-42 ("[a]t this stage, the web address provides information sufficient to surmise the name of the video, and the FID similarly provides information sufficient to surmise the identify of the user."); *Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1021 (D. Minn. 2023) (finding complaint plausibly alleged dissemination of PII where complaint alleged that "each time Mr. Feldman has watched video content on startribune.com, the Star Tribune "simultaneously disclosed [his FID] and the name of the video/content that he viewed to Facebook via Facebook Pixel."); *Harris*, 662 F.Supp.3d at 1334 (N.D. Ga. 2023) (denying motion to dismiss finding similar allegations satisfied VPPA's disclosure requirement); *see also Belozerov*, 646 F.Supp.3d at 314 (collecting cases); *Lebakken*, 640 F. Supp. 3d at 1342.

The Third Circuit instead adopted the "ordinary person" test, limiting the VPPA's disclosure prohibition to "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior," which standard the Ninth Circuit has also adopted. *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d at 267, 267, 284 (3rd Cir. 2016); *Eichenberger*, 876 F.3d at 985. Recently, the Second Circuit adopted a version of the "ordinary person" test. *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 51-54 (2d Cir. 2025). *Solomon* went further, finding that under the unique facts of that case, such as disclosures of a confusing URL and no explicit video title, an ordinary person was unable to identify the plaintiff's video-watching habits. *Id.* at 54-55. As discussed below, this Court should decline to follow *Solomon* because it is non-binding, breaks from the majority position with respect to Meta pixel claims under both tests, has been rejected by every court to consider it outside the Second Circuit, and is based on inapposite facts.

Citing *Solomon* and its Second-Circuit progeny, C-SPAN implies that Plaintiffs' claim fails under the ordinary person test. Not so. First, this Court need not apply the "ordinary person" standard

which, as described below, improperly narrow's the VPPA's plain language. That standard has not been adopted by the D.C. Circuit or any other binding authority, and to Plaintiffs' knowledge, no other district court in the Circuit. The First Circuit's reasonable person standard is the better reasoned approach and more consistent with the VPPA's plain language.

**ii. Plaintiffs' Allegations Satisfy Either Standard.**

Regardless, even under the "ordinary person" standard, Plaintiffs have plausibly alleged that C-SPAN disclosed PII in violation of the VPPA. The *Nickelodeon* decision itself recognized that "even a numeric identifier might qualify as personally identifiable information, at least in certain circumstances." 827 F.3d at 289 fn.174. Moreover, the overwhelming majority of courts around the country have concluded that Meta Pixel-based disclosures of FIDs plausibly alleged the disclosure of protectable PII under the "ordinary person standard." *See, e.g.*, *Martinez v. D2C, LLC*, 2023 WL 6587308, at *4 (S.D. Fla. Oct. 10, 2023) (citations omitted) ("Assuming the 'ordinary person' standard applies, as Univision submits, the Court finds the proposed amended complaint's allegations sufficient: 'The [FID] is a unique identifier that is enough, on its own, to identify a person.'"); *Mendoza*, 2024 WL 2316544, at *4 (citing reasonable person standard, accepting allegations that FIDs and website activity enabled identification of website activity, and noting that most, if not all, courts to have addressed the question have found that FIDs are PII); *Feldman*, 659 F. Supp. 3d at 1021 ("As the Complaint describes things then, connecting a Facebook ID to a specific person, a URL to a particular video, and the specific person to the particular video is a reasonably straightforward exercise… as the Complaint describes it, the information is both reasonably comprehensible and plausibly as usable as the GPS data addressed in *Yershov*."); *Lebakken*, 640 F. Supp. 3d at 1341-42 (citing reasonable person standard, finding allegations of disclosure of FID and email address in connection with video viewing information to Facebook sufficient); *see also Jackson v. Fandom, Inc.*, 2023 WL 4670285, at *4 (N.D. Cal. July 20, 2023); *MacAlpine v. Onnit Labs, Inc.*, No. 1:24-cv-00933, at *9-10 (W.D. Tex May 14, 2025) (attached as Exhibit A); *Archer v. NBCUniversal Media, LLC,*

*Inc*., No. 2:24-cv-10744, at *7 (N.D. Cal July 2, 2025) (attached as Exhibit B); *Edwards v. Mubi, Inc*. No. 5:24-cv-00638, at *5-6 (N.D. Cal. Mar. 31, 2025) (attached as Exhibit C); *Braun v. Philadelphia Inquirer, LLC*, 2023 WL 7544160, at *4 (E.D. Pa. Nov. 13, 2023); *Haines v. Cengage Learning, Inc.*, No. 1:24-cv-710, at *16-17 (S.D. Ohio May 5, 2025) (report and recommendation adopted in *Haines v. Cengage Learning, Inc.,* 2025 WL 2045644, at *3-4 (S.D. Ohio. Jul. 22, 2025)) (attached as Exhibit D) (all finding the plaintiffs stated a VPPA claim even if the ordinary person standard applied in Pixel-based disclosure cases with materially identical allegations). These authorities each involved Meta Pixel-based disclosures of FIDs and support that Plaintiffs have plausibly alleged the disclosure of protectable PII, regardless of the applicable standard.

**iii. The Court Should Not Follow *Solomon* or Apply the Ordinary Person Standard.**

This Court should also join every other court outside the Second Circuit in declining to follow *Solomon*'s fact-specific holding and its Second Circuit progeny. *See Haines*, 2025 WL 2045644, at *3-4 (declining to consider *Solomon* and *Hughes v. Nat'l Football* League, 2025 WL 1720295 (2d Cir. Jun. 20, 2025)[4] because they are unbinding and "sit[] 'in start contrast' to the majority of district courts."). In *Garcia v. Bandai Namco Entertainment Am. Inc.*, 2025 WL 2451033, at *8 (C.D. Cal. Aug. 7, 2025), the court recently declined to follow *Solomon*, noting that even in the Ninth Circuit, "[m]ost courts have found the [Meta] Pixel discloses PII at the pleading stage, at least where plaintiffs also allege personal information existed on their Facebook page that could be used to readily identify them." The court was not aware of any other district courts in the Ninth Circuit addressing *Solomon*'s unique facts and finding that an ordinary person could not discern identifiable information from Meta's pixel, holding "[a]t a minimum, it is a question of fact whether an ordinary person could identify Plaintiff's [FID] and video [content]." *Id*.

Likewise, the court in *Plotsker v. Envato Pty Ltd.*, 2025 WL 2481422, at *8, n.7 (C.D. Cal.

---

[4] The first page of *Hughes* also states that it is a summary order, which states "without any precedential effect."

Aug. 26, 2025) also recently rejected *Solomon*'s rationale, finding that FIDs readily enable an ordinary person to identify an individual and noting that the "ordinary person that the Second Circuit envisions appears to be one who is particularly unsophisticated or unmotivated to understand the information presented." *Id*.

Notably, the Second Circuit panel that decided *Solomon* did not articulate a brightline rule that a FID will never satisfy the "ordinary person" standard. Correctly so, because that panel's decision would then have to explicitly overrule countless federal district court decisions from New York alone spanning a decade that hold otherwise. *See Robinson v. Disney Online*, 152 F. Supp. 3d 176, 184 (S.D.N.Y. 2015) ("A Facebook ID, as the Hulu court found, is thus equivalent to a name—it stands in for a specific person, unlike a device identifier."); *Czarnionka*, 2022 WL 17069810, at *3 ("The FID itself represents a particular individual."); *Lamb v. Forbes Media LLC*, 2023 WL 6318033 (S.D.N.Y. Sept. 28, 2023); *Golden*, 688 F. Supp. 3d at 159; *Lee v. Springer Nature Am., Inc.*, 2025 WL 692152, at *15 (S.D.N.Y. Mar. 4, 2025). Therefore, *Solomon* is limited to the specific allegations in that complaint, which are unlike the allegations before this Court. *Compare Solomon*, 136 F.4th at 54-55 (describing confusing URL and crowded screenshots of code) *with* ¶45 (transmitted data includes exact video title and straightforward URL, and the Plaintiffs do not allege "many other lines of code").

*Manza v. Pesi, Inc.*, --F. Supp. 3d--, 2025 WL 1445762, at *3 (W.D. Wis. May 20, 2025), another post *Solomon* decision, offers the most thorough analysis of *Solomon* and the "ordinary person" standard, rejecting it and denying a motion to dismiss a Meta pixel VPPA case. Starting with the statute's plain text, the *Manza* court explained that there is no textual basis for the "ordinary person" standard and that under the statute "information that uniquely identifies a customer to a third party can qualify as PII, regardless of whether the third party is an "ordinary person" or a social media company." *Id.* at *5. The court noted that "[t]he courts that have adopted the "ordinary person" standard have identified little textual basis for the limitation they impose." *Id.* The court also determined that the "ordinary person" standard unreasonably cabined the statute given that the

definition of PII provided is broad. *Id.*; *see also* 18 U.S.C. §2710(a)(3)) (defining PII only as "includ[ing]" information that identifies an individual without further limitation or qualification).

*Manza* next concluded that courts' use and application of legislative history to justify the "ordinary person" standard was unsound. *Id*. at *6. Discussing *Nickelodeon*, the court concluded that the Third Circuit's decision in *Nickelodeon* adopting the ordinary person standard does not explain how anything in the legislative history supports a narrow reading of the statute. If anything, the text, purpose, and history of the statute suggest that Congress intended the meaning of PII to be expansive so that it could adapt to changing technology. *Id.*

Similarly, the *Manza* court was skeptical about overreliance on the factual origins of the statute and the "state of technology in 1988" to determine what conduct the statute covers. *Id.* On this point, the court pointed to the salience of the statute's plain text, writing: "The question is not whether Congress had a plaintiff's specific problem in mind when it enacted the statute, but whether the statute uses language broad enough to cover the problem. This court has concluded that it does." *Id.*

Finally, the *Manza* court rejected both the arguments that Congress's non-amendment of PII in 2013 supports a narrowing of the definition of PII from its plain text, and the argument that the "ordinary person" standard enables videotape service providers to better comply with the law. Here, the *Manza* court pointed to Supreme Court precedent counseling against using Congress's decision not to amend a statute as evidence of legislative intent. *Id*. at *7. As to the purported benefits of compliance with the ordinary person standard, *Manza* was rightly skeptical, finding that reliance on the "ordinary person's" capabilities is hardly a sound basis by which a commercial entity can determine whether its conduct is lawful. *See id*. at *7 ("How computer savvy is the "ordinary person?" What access to information does she have? How motivated is she to obtain that information? These are all questions that a video tape service provider must ask itself under the "ordinary person" standard, and they do not have obvious answers."). The *Manza* court concluded by noting that the statute already provides guardrails to keep videotape service providers from committing "innocent or negligent

mistakes" by covering only knowing violations. *Id.*

As in *Manza*, the Court should refuse to apply the "ordinary person" test. Regardless of which test the Court applies, however, it should sustain Plaintiffs' claim because they pled facts establishing that C-SPAN knowingly disclosed to Facebook information that "identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *See* 18 U.S.C. § 2710(a)(3). The court should also follow every other court outside the Second Circuit in declining to follow *Solomon*'s fact-specific holding, which departs from nearly every other district court to have considered the issue.

## IV. CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court deny C-SPAN's motion to dismiss in its entirety and, in the alternative, provide leave to amend if the Court grants the motion.

Dated: September 4, 2025

*/s/ Stan M. Doerrer*
Stan M. Doerrer (DC Bar # 502496)
LAW OFFICE OF STAN M. DOERRER PLLC
950 N. Washington Street
Alexandria, VA 22314
Tel: 703-348-4646
Fax: 703-348-0048
stan@doerrerlaw.com

Katrina Carroll*
CARROLL SHAMBERG LLC
111 West Washington Street Suite 1240
Chicago, IL 60602
Office: 872-215-6205
Mobile: 847-848-1384
katrina@csclassactions.com

**Pro Hac Vice*

*Counsel for Plaintiffs Matthew Horan & John Sullivan*

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 4, 2025, the foregoing was filed and served on all Counsel of record in this matter via this Court's ECF system.

/s/ Stan M. Doerrer