**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MATTHEW HORAN, et al.

Plaintiff,

Case No. 25-CV-01114-BAH

v.

NATIONAL CABLE SATELLITE CORPORATION,

Defendant.

**REPLY MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS**

As Defendant National Cable Satellite Corporation ("C-SPAN") established in its Memorandum of Points and Authorities in Support of its Motion to Dismiss ("Motion") (Dkt. 15), Plaintiffs have not—and cannot—plausibly allege a claim against it for violation of the Video Privacy Protection Act ("VPPA").

In their Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss ("Opposition" or "Opp."), Plaintiffs attempt to revive their failing claim by recharacterizing their allegations and misinterpreting the legal landscape. Such conclusory and unsupported assertions do not hold up under the well-reasoned guidance from this Court and multiple United States Courts of Appeals.

First, Plaintiffs' attempts to distinguish the D.C. Circuit's recent affirmance of this Court's holding in *Pileggi v. Washington Newspaper Publishing Co.* ("*Pileggi II*"), 146 F.4th 1219 (D.C. Cir. 2025) underscores that, according to binding precedent, Plaintiffs simply cannot be considered "consumers" under the VPPA because the disclosure at issue did not originate from their MyC-SPAN subscriptions.

Second, Plaintiffs cannot escape the fact that, by their own allegations, the disclosure at issue involved "querystring code" that is indecipherable to the general population. Under the majority test—and even the older test no longer applied by most courts—these lines of code cannot constitute personal identifying information as defined in the VPPA.

For these reasons, and those set forth more fully below and in its Motion, C-SPAN respectfully submits that the Court should dismiss Plaintiffs' Complaint with prejudice.

## I. PLAINTIFFS CANNOT ESTABLISH THEY ARE CONSUMERS.

As C-SPAN set forth in its Motion, Plaintiffs failed to establish that they are "consumers" as that term is defined in the VPPA. *See* Mot. at 7–8 (citing *Pileggi v. Washington Newspaper Publ'g Co.* ("*Pileggi I*"), No. 23-cv-00345, 2024 WL 324121 (D.D.C. Jan. 29, 2024), *aff'd*, 146 F.4th 1219 (D.C. Cir. 2025)). After C-SPAN submitted its Motion, the D.C. Circuit affirmed this Court in *Pileggi II*. In a tacit acknowledgment that *Pileggi II* further supports dismissal, Plaintiffs attempt to distinguish it in their Opposition. However, a review of *Pileggi II's* holdings and facts demonstrate that it mandates dismissal because Plaintiffs have not and cannot allege that they are "consumers" under the VPPA.

### A. Plaintiffs' Attempts to Distinguish *Pileggi II* Fail.

In *Pileggi II*, the D.C. Circuit affirmed this Court's holding that the plaintiff was not a "consumer" within the meaning of the VPPA because "she did not sufficiently allege the requisite connection between the newsletter for which she had registered and the private information disclosed to Meta." 146 F.4th at 1223. The newsletters the *Pileggi* plaintiff received contained embedded news videos and hyperlinks to the defendant's website—or, in other words, her subscription expressly related to, and delivered various means of viewing, the defendant's digital video content. *Id.* at 1225. Nonetheless, the D.C. Circuit held that the plaintiff was not a consumer under the VPPA because she did not allege that the information disclosed came from

the newsletter subscription itself. *Id.* at 1237 ("Subscribing to an e-newsletter that includes videos and video links, by itself, is not enough to make someone a 'consumer' under the [VPPA]. Instead, the videos for which viewing history is disclosed ***must be the same video materials*** or services that the individual purchased, rented, or subscribed to.") (emphasis added).

In other words, the D.C. Circuit held that the plaintiff was not a consumer under the VPPA—even when the plaintiff subscribed to receive video content from the defendant's website—because the video-viewing data disclosed was not the same video content she received as a subscriber. *Id.*

For obvious reasons, Plaintiffs attempt to distance themselves from this binding authority, but their arguments cannot change its clear application and outcome. As C-SPAN laid out in its Motion, Plaintiffs did not allege that the disclosed information originated from their MyC-SPAN accounts. Mot. at 9.[1] Instead, the disclosed information originated from digital content accessible to the public at large and unrelated to the subscription itself. *See* Compl. ¶¶ 44–45 (Dkt. 1), Mot. at 5. Plaintiffs' argument that the MyC-SPAN subscription "granted Plaintiffs premium features for[] viewing C-SPAN's digital video content," Opp. at 4, does nothing to impact the fact that the video-viewing data disclosed was not part of the subscription itself. Under binding precedent, this forecloses Plaintiffs' path to recovery under the VPPA. *Pileggi II*, 146 F.4th at 1227.

[1] Moreover, C-SPAN's Motion validly disputed Plaintiffs' conclusory assertion that the MyC-SPAN account offers them video or audio-visual content at all. Mot. at 8. In response, Plaintiffs offer only that their MyC-SPAN accounts are "related to" or "connected to" the video content available on the Website, but they do not contend that the MyC-SPAN account, itself, is the source of any audio-visual content disclosed by the Meta Pixel. Opp. at 4–5. This deficiency is issue-dispositive under *Pileggi II*, 146 F. 4th at 1235.

None of the other cases on which Plaintiffs rely can change this necessary outcome. For example, *Golden v. NBCUniversal Media, LLC*—which supports the notion that dismissal of a VPPA claim is appropriate where a plaintiff fails to allege that the video-viewing information disclosed to a third-party consisted of the same video materials to which the web visitor subscribed—is wholly irrelevant to Plaintiffs' allegations here. 688 F. Supp. 3d 150 (S.D.N.Y. 2023).

In sum, Plaintiffs cannot allege that the video-viewing information allegedly disclosed was from their use of the same video-viewing services provided via their MyC-SPAN subscriptions, and the Court should dismiss their Complaint for this reason alone.

### B. The Weight of the *Pileggi I* Factors Dictate That Plaintiffs Are Not Subscribers.

Plaintiffs are not consumers for the independent reason that they have not—and cannot—allege any sort of "ongoing commitment or relationship" with C-SPAN sufficient to convert them from mere Website visitors to VPPA consumers.

As C-SPAN notes in its Motion, in *Pileggi I*, this Court articulated a non-exhaustive list of factors to determine whether a website or application user has an ongoing commitment or relationship with the website or application owner and is thus a "subscriber" for the purposes of the VPPA: payment, registration, commitment, delivery, expressed association, and access to restricted content. Mot. at 7 (citing *Pileggi I*, 2024 WL 324121, at *9).

As C-SPAN also notes in its Motion—and Plaintiffs do not dispute—the Eleventh Circuit's application of this framework in *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251 (11th Cir. 2015), has become an instructive guide for all VPPA cases across jurisdictions. *See* Mot. at 7 (citing *Ellis*, 803 F.3d at 1257). In *Ellis*, the Eleventh Circuit reversed the district court—finding that a plaintiff was not a "subscriber" under the VPPA despite the fact that she downloaded the

Cartoon Network mobile application to her personal device, viewed video clips on the application, and her specific video-viewing information was disclosed along with device-identifying information to a third-party software developer without the plaintiff's consent. 803 F.3d at 1254. The *Ellis* court found these allegations insufficient to convert the plaintiff into a subscriber because there was no evidence of "ongoing commitment or relationship between the user and the entity which owns and operates the [application]." *Id.* at 1257.

In their Opposition, Plaintiffs fail to allege that their use of the MyC-SPAN subscription constitutes a significant ongoing commitment or relationship with C-SPAN than that evidenced by downloading a mobile application. Plaintiffs also do not challenge that they were not "free to delete the app without consequences whenever [they like,]" or that the MyC-SPAN subscription was otherwise more than "the equivalent of adding a particular website to one's Internet browser as a favorite, allowing quicker access to the website's content." *Id.* In other words, Plaintiffs failed to meaningfully distinguish *Ellis*. *Id*.

Plaintiffs further concede that the My-CSPAN feature is free and "cancelable without consequences," and thus the "payment" and "commitment" factors outlined in *Pileggi I* weigh against a finding that Plaintiffs are subscribers. Opp. at 5–6. And, Plaintiffs similarly acknowledge that the MyC-SPAN account does not provide any access to restricted content. *Id.*[2]

In short, Plaintiffs' allegations regarding the nature of their subscription are substantially similar in practice and effect to the *Ellis* plaintiff's allegations regarding the Cartoon Network application, and like the application described in *Ellis* and *Pileggi I*, the My-CSPAN feature is

[2] Although Plaintiffs' allegations that they provided some information to C-SPAN to create their MyC-SPAN accounts may weigh in favor of the "registration" and "association" factors, these allegations alone are insufficient to overcome the weight of the evidence against them. Indeed, if the provision of information to create an account were outcome-determinative, there would be no need for a multi-factor test.

functionally equivalent to simply adding a bookmark to the C-SPAN Website on any Internet browser in order to enable a web visitor to more quickly access the website's content. On balance, this is not sufficient indicia of a subscriber relationship.

## II. PLAINTIFFS FAIL TO REBUT THAT THEY HAVE NOT PLAUSIBLY ALLEGED KNOWING DISCLOSURE OF PERSONALLY IDENTIFIABLE INFORMATION.

As made clear in the Motion, Plaintiffs' Complaint does not plausibly allege that the data collected from the Website and disclosed to Meta is personally identifiable information under the VPPA. *See* Mot. at 12. All of Plaintiffs' attempts to avoid the dismissal required by their pleading deficiencies fail.

First, regardless of conclusory characterizations in the Opposition, Plaintiffs cannot escape the fact that, as alleged, the "querystring parameters" of disclosed data is not "personally identifiable information" under the VPPA. Indeed, under either the "Ordinary Person" test applied by the overwhelming majority of Circuits, or the older "Reasonably Foreseeable" test adopted only by the First Circuit Court of Appeals, Meta's collection of this string of code under the circumstances Plaintiffs allege does not amount to disclosure of personally identifying information in violation of the VPPA.

### A. Artful Descriptions Aside, Plaintiffs Allege Only Disclosure of Lines of Code.

In their Opposition, Plaintiffs attempt to overcome their fatal pleading deficiencies by characterizing the data Meta collected as Plaintiffs' video title, the associated URL, and their FID from the Website by way of the Meta Pixel. Opp. at 9. But Plaintiffs later concede that their pleadings are actually quite different. Indeed, instead of disclosing those data elements, what Plaintiffs actually allege is that information consists of "querystring parameters and cookie values[,]" along with a "c_user cookie" (which ***Meta*** places on the web browsers of its accountholders) hidden between lines of code. Compl. ¶¶ 38–39, 44. In other words, Plaintiffs

allege the disclosure of complex code indecipherable by nearly all people. Plaintiffs try to hide this fact because, under any applicable standard, it is fatal to their claim against C-SPAN.

### B. Contrary to Plaintiffs' Request, This Court Should Follow the Clear Majority Approach and Apply the Ordinary Person Test.

Plaintiffs' attempts to frame *Solomon's* application of the majority test as an outlier are nothing but a futile attempt to paint the legal landscape in a false light. Contrary to the singular out-of-circuit district court opinion on which Plaintiffs rely, the Ordinary Person Test was developed from significant well-reasoned analysis of the statute's plain language, the legislative history, and other accepted canons of statutory construction. *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (analyzing the "knowing disclosure" language of the statute and determining that "the statute views disclosure from the perspective of the disclosing party" and "looks to what information a video service provider discloses, not to what the recipient of that information decides to do with it. As a result, 'personally identifiable information' must have the same meaning without regard to its recipient's capabilities." (citing *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015))); *In re Nickelodeon Cons. Priv. Litig.*, 827 F.3d 262, 285–90 (6th Cir. 2016) (engaging in an extensive review of the VPPA's legislative history before concluding that "personally identifiable information under the [VPPA] means the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior."); *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 52 (2d Cir. 2025) ("[E]ven though the words are not without some ambiguity, they are more naturally read as referring to information that would permit an ordinary person to learn another individual's video-watching history.").

Plaintiffs' attempt to call into question the strength and ubiquity of the Ordinary Person Test falls flat. The primary case on which they rely, *Manza v. Pesi, Inc.*, 784 F. Supp. 3d 1110

(W.D. Wis. 2025), is not instructive—particularly when viewed in light of the substantial weight of contradictory authority. In *Manza*, a judge sitting in the Western District of Wisconsin unilaterally departed from the majority of circuit courts, simply concluding that "ID numbers uniquely associated with a specific customer qualify as PII under the VPPA when they are paired with the names of videos the customer obtained from the defendant" without any further analysis of its own regarding the appropriateness of such a bright-line rule. 784 F. Supp. 3d at 1123.

As noted above, multiple circuit courts have adopted the well-reasoned Ordinary Person Test. C-SPAN respectfully submits that this Court should decline to extend *Manza*'s holding here, and instead employ the analysis adopted by myriad federal courts and analyze whether the code Meta collected from the Website meets the definition of personal identifying information under the Ordinary Person Test.

**C. The Information Allegedly Disclosed Fails the Ordinary Person Test.**

Under the Ordinary Person Test, data is considered personal identifying information if it "would, with little or no extra effort, permit an ordinary recipient to identify [a web visitor's] video-watching habits." *Solomon*, 136 F.4th at 54 (citing *Nickelodeon*, 827 F.3d at 284). For the purposes of the VPPA, this information encompasses only that which "would allow an ordinary person to identify a consumer's video watching habits, but not information that only a sophisticated technology company could use to do so." *Id.* at 52.

In a tacit admission that the Complaint fails under this standard, Plaintiffs argue that the rules outlined in *Solomon* are "fact specific" and "limited to the specific allegations in that complaint[.]" Opp. at 12–13. However, even a cursory review of the Second Circuit's opinion makes clear that the principles it applied—which are the same principles applied by the Third and Ninth Circuits in *Nickelodeon* and *Eichenberger*—apply equally here, and that the terms in

the VPPA should be interpreted in "the broader context of the statute as a whole." *Solomon*, 136 F.4th at 53.

But, in any event, even if *Solomon* were applicable only to cases in which a plaintiff alleges that a website's use of the Meta Pixel constitutes violation of the VPPA, this ***is*** one such case. Indeed, the sole basis of Plaintiffs' Complaint is that the Meta Pixel on the Website disclosed "various querystring parameters and cookie values" to disclose information relating to their video-viewing activities and FIDs. Compl. ¶ 44. Under the majority rule, this type of allegation is simply insufficient as a matter of law. *Solomon*, 135 F.4th at 45 (noting the plaintiff's allegation that the defendant—a digital streaming company—violated the VPPA by using the Meta Pixel to capture "the URL and title of each video that a user accesses on a provider's website" along with a user's FID was insufficient to constitute personal identifying information under the statutory definitions).

Just as dismissal was appropriate (and affirmed) in *Solomon* because the allegedly disclosed information was hidden within "some twenty-nine lines of computer code" and the words of the video title were "interspersed with many characters, numbers, and letters" such that it was "implausible that an ordinary person would understand, with little to no effort" that the data disclosed video-viewing information, Plaintiffs' concession that the disclosed data consists of nothing more than "querystring parameters" and "cookie values" dictate the same result is warranted here.

Put simply, as the majority rule has recognized, the VPPA does not assume that the ordinary person is fluent in coding, and under the plain language of the VPPA, querystrings of code do not constitute personal information as a matter of law. *See Nickelodeon*, 827 F.3d at 283. For example, in *Solomon*, the Second Circuit found the complaint to be "devoid of any details

about *how* an ordinary person would use an FID to identify [plaintiff]," and it rejected the plaintiff's contention that an ordinary person could gain access to this information by simply "entering 'facebook.com/[plaintiff's FID]' into any web browser." 136 F.4th at 54–55; *see also Taino v. Bow Tie Cinemas, LLC*, No. 23-cv-05371, 2025 WL 2652730, at **7–8 (S.D.N.Y. Sept. 16, 2025) (finding it implausible "that an ordinary person would see the nine-line code of the cookie transmitted—which includes the 'c_user' phrase—to cross reference it with the www.facebook.com in the URL section and conclude that the phrase was a person's FID."); *Salazar v. NBA*, No. 1:22-cv-07935, 2025 WL 2830939, at *5 (S.D.N.Y. Oct. 6, 2025) (collecting cases). Further, and contrary to Plaintiffs' contention, this analysis is not limited to courts within the Second Circuit. *See, e.g.*, *Mull v. Gotham Distrib. Corp.*, No. 24-cv-6083, 2025 WL 2712215, at * 3 (E.D. Pa. Sep. 22, 2025) ("[A] Facebook ID and video title embedded in computer code does not constitute [PII], in part because only a sophisticated company could decipher the information in the code.").

Therefore, because the data allegedly disclosed in this case is identical to that found insufficient under the Ordinary Person Test in *Solomon*, *Mull*, *Taino*, *Salazar*, and others—and because, as a practical matter, it is implausible that an ordinary person could access the code at issue, locate Plaintiffs' FID, extract it, and interpret its meaning to identify Plaintiffs—Plaintiffs have not sufficiently alleged disclosure of their personal identifying information.

### D. The Alleged Disclosure Fails to Meet the Definition of Personally Identifiable Information Under the Reasonably Foreseeable Test.

Even if the Court decides to break from the overwhelming majority of circuit courts and apply the Reasonably Foreseeable Test, Plaintiffs' allegations still fail to plausibly establish that C-SPAN disclosed their personal identifying information.

Under the Reasonably Foreseeable Test, data constitutes personally identifiable information if it is "reasonably and foreseeably likely to reveal which . . . videos [a person] has obtained." *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016). According to this approach, liability attaches when a video service provider knowingly discloses information that has "firm and readily foreseeable" ties to an individual user. *Id.*

Here, Plaintiffs' allegations do not plausibly establish either that the disclosed information creates firm and readily foreseeable ties to them, or their video-viewing information, or that C-SPAN configured the Meta Pixel with the knowledge that Meta has the capabilities to identify C-SPAN's individual subscribers. *Cf. Joseph v. IGN Ent., Inc.*, No. 24-cv-11579, 2025 WL 2597913, at *3 (D. Mass. Jul. 10, 2025). The cases Plaintiffs cite to the contrary do not change this analysis.

In sum, Plaintiffs' allegations fail to establish that the data collected from C-SPAN's Website constitutes personally identifying information under any standard, and their claim should be dismissed.

**CONCLUSION**

For these reasons, and those set forth in its Motion, C-SPAN respectfully requests that the Court dismiss Plaintiffs' Complaint with prejudice.

Respectfully submitted,

BALLARD SPAHR LLP

October 22, 2025

*/s/ Lauren P. Russell*

Lauren P. Russell (#1697195)
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200
Fax: (202) 661-2299
russelll@ballardspahr.com

Hilary Lane (NY0604)
1675 Broadway, 19th Floor
New York, New York 10019-5820
Tel: (646) 346-8032
Fax: (212) 233-1946
laneh@ballardspahr.com

Alexia Chapman (*pro hac vice forthcoming)*
1800 Larimer Street, Suite 1600
Denver, CO 80202-5596
Tel.: (303) 299-7354
Fax: (303) 296-3956
chapmana@ballardspahr.com

*Counsel for Defendant National Cable Satellite Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of October, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

By: */s/ Lauren P. Russell*
Lauren P. Russell (#1697195)