## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MATTHEW HORAN, *et al.*,

      Plaintiffs,

    v.

NATIONAL CABLE SATELLITE
CORPORATION,

      Defendant.

Civil Action No. 25-1114

Judge Beryl A. Howell

## MEMORANDUM OPINION

Two plaintiffs filed suit, on behalf of themselves and a proposed class, alleging that defendant National Cable Satellite Corporation illegally collected and shared information about plaintiffs' viewing of videos on the website for the Cable-Satellite Public Affairs Network ("C-SPAN"), which is owned and operated by defendant, and in so doing, defendant was able to associate such viewing activity with plaintiffs' Facebook accounts and thereby identify plaintiffs' video-watching behavior without their consent, in violation of their statutorily protected privacy rights.  Plaintiffs claim this activity violates the federal Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, which generally prohibits a "video tape service provider" from "disclos[ing], to any person, personally identifiable information concerning any consumer."  Defendant now moves to dismiss the complaint for failure to state a claim.  Def.'s Mot. to Dismiss ("Def.'s Mot."), ECF No. 15.  As explained in more detail below, because plaintiffs have failed to demonstrate that they qualify as "consumers," within the meaning of the VPPA, and that the shared data was personally identifiable information, the motion to dismiss is granted.

# I.    BACKGROUND

Set out below is the factual and procedural background relevant to resolving defendant's pending motion to dismiss.

## A.  Factual Background

Plaintiffs "regularly watched prerecorded videos available on" C-SPAN's website.  Class Action Compl. ("Compl.") ¶¶ 8, 13, ECF No. 1.  "C-SPAN's website features videos on Congress, the Supreme Court, the White House, key political events, foreign leader addresses, [and] major issues" and contains more than "278,231 hours of content."  *Id.* ¶ 31.  By collecting information about use of this video library, C-SPAN is able to report that its videos "have had more than 259,938,057 views" and that "[o]ver the last two years C-SPAN has had more than 45,400,000 unique users visit its site."  *Id.*  The website allows any visitor to view any pre-recorded video on the website but also allows visitors to create "a MyC-SPAN Account at no cost."  *Id.* ¶ 32.  Such account holders have "the ability to *inter alia* create and save clips of C-SPAN video content to their profile page for convenient access; the option to subscribe to email notifications regarding updates on bookmarked video content; access to video recommendations and the ability to download video content."  *Id.*  Plaintiffs have maintained MyC-SPAN Accounts for several years. *Id.* ¶¶ 8, 13.

C-SPAN website visitors, whether or not MyC-SPAN Account holders, may "subscribe to four distinct digital newsletters relating to topics addressed on its website" so that "[e]ach newsletter is sent directly to the user's inbox and frequently contains multiple links to various videos on the C-SPAN website."  *Id.* ¶ 33.  Plaintiffs, in addition to signing up for MyC-SPAN Accounts, subscribed to the C-SPAN sponsored newsletters.  *Id.* ¶ 72.  Signing up for either the MyC-SPAN Account or digital newsletter service requires a user to provide an email address, and then use of either service reveals the user's IP address to defendant. *Id.* ¶ 34.  "At no point during

the sign-up process or otherwise did Defendant obtain written consent from" plaintiffs "to collect [their] Personal Viewing Information." *Id.* ¶¶ 8, 13.

Plaintiffs also maintain accounts on Facebook, described as "a social media platform with over 2.9 billion active monthly users," *id.* ¶ 36; *see id.* ¶¶ 9, 14, that "requires its users to use their real identities, including first and last name" and to "provide their birthday and gender," *id.* ¶ 36. "When a user signs up to Facebook, Facebook assigns [each user] a unique [Facebook Identification number ("FID")]," which, plaintiffs allege, "allows any ordinary person to identify a Facebook user with ease." *Id.* ¶ 37. For instance, if one enters "the term 'Facebook' and a user's FID . . . into a Google search, the person's Facebook profile will appear in the results." *Id.* A user's profile may also be accessed "by typing 'facebook.com/' into the address bar of any browser and appending the FID at the end." *Id.* In addition to creating an FID, Facebook places several cookies, including the "c_user" cookie, containing the user's FID number, onto the user's device when the user logs into Facebook through a web browser. *Id.* ¶ 38. The "c_user" cookie "track[s] user activity across the web on the same browser, even if the user does not visit Facebook.com again" and "remains on the user's browser for up to a year after their last visit to Facebook unless they manually log out." *Id.* ¶¶ 38-39. "By using the FID, which is specific to an individual, Facebook can match user activity across different devices and browsers, creating a comprehensive user profile that includes information about the websites the user visited on each device." *Id.* ¶ 39. By tracking users, Facebook "collect[s] vast amounts of data on user interests, behavior, and connections," which enables the site "to generate substantial advertising revenue by offering businesses the ability to target users with specific interests, retarget ads to users who visited their site without making a purchase, and analyze the types of Facebook users visiting their site by leveraging user demographics, interests, and behaviors on other websites." *Id.* ¶ 40.

Facebook, which is owned and operated by Meta Platforms, Inc., has also developed code known as the Meta "pixel." *Id.* ¶ 41; *see id.* ¶ 3. Pixels, also known as web beacons, "are small, *invisible* images that a browser downloads like any other images on a webpage." *Id.* ¶ 41 (emphasis in original). "When a user visits a web page containing the Meta Pixel, the pixel contacts the Facebook ad server," and "[i]f the user has an active c_user cookie on their browser, Facebook receives the event information along with the user's FID, effectively linking the user's specific actions on the website to their Facebook profile." *Id.* ¶ 42. Plaintiffs allege that "Meta's pixel facilitates its tracking and data collection process, allowing Facebook to gather information about user behavior on the business's website and connect it to the user's Facebook profile using the c_user cookie and FID." *Id.* ¶ 41. To facilitate access to "user demographics, interests and behaviors," organizations "install the Meta 'pixel' on [their] website[s]." *Id.* ¶¶ 40-41.

Plaintiffs allege that C-SPAN "installed the Meta Pixel on its Website and on the individual pages on its Website" and that this pixel sends Facebook "various querystring parameters and cookie values which disclose the name of the videos watched by the consumer, the URLs of the webpages hosting the videos, and the consumer's FID, among other information." *Id.* ¶¶ 43-44. Such data "is transmitted to Facebook each time a [user] accesses any of the tens of thousands of videos available on the C-SPAN website," *id.* ¶ 45, without being "anonymized or de-identified" because "Facebook received the Personal Viewing Information together (including the FID) as a single communication, enabling a direct connection between the user and their viewing activity," *id.* ¶ 46. Plaintiffs further allege that "[w]ith only a person's FID and the title of the prerecorded video material (or URL where such material is available) that the subscriber watched on Defendant's Website . . . any ordinary person could learn the identity of the person to whom the FID corresponds and the title of the specific prerecorded video material that the subscriber

watched." *Id.* ¶ 48.  Plaintiffs claim that these transmissions from C-SPAN's website to Facebook violate the VPPA.

### B.  Procedural Background

On April 14, 2025, plaintiffs brought this putative consumer digital privacy class action against defendant under the VPPA, Compl. ¶¶ 1-2, which authorizes a cause of action for "the aggrieved person" against "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider," 18 U.S.C. § 2710(b)(1).  Defendant subsequently filed the pending motion to dismiss, *see* Def.'s Mot. at 1, which is now ripe for resolution, *see* Pls.' Mem. in Opp'n ("Pls.' Opp'n"), ECF No. 18; Def.'s Reply to Opp'n to the Mot. ("Def.'s Reply"), ECF No. 21.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability" and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 556-57).  "Factual allegations, although assumed to be true, must still 'be enough to raise a right to relief above the speculative level.'"  *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Twombly*, 550 U.S. at 555).  Courts "do not assume the truth of legal conclusions, nor do [courts] 'accept inferences that are unsupported by the facts set out in the complaint.'"  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678, and *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).  In

determining whether a complaint fails to state a claim, a court may consider only the facts alleged in the complaint and "any documents either attached to or incorporated in the complaint and matters of which the court may take judicial notice." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alterations in original accepted and citation omitted).

## III.    DISCUSSION

Defendant seeks dismissal of the complaint on grounds that: (1) "Plaintiffs are not 'consumers' of C-SPAN's video content," within the meaning of the VPPA, Def.'s Mem. of P & A in Supp. of Def.'s Mot. to Dismiss ("Def.'s Mem."), at 2, ECF No. 15-1; and (2) "Plaintiffs fail to allege facts sufficient to establish that C-SPAN transmitted data to Meta that, when paired with a website visitor's FID, could be used by any ordinary person to identify a particular visitor's video viewing history," *id.* at 3.[1]  These grounds suffice to require dismissal of the complaint, as examination of the statutory language in the VPPA and recent guidance from the D.C. Circuit and other circuit courts of appeals confirms.

### A.  Plaintiffs Are Not "Consumers" or "Subscribers" Under the VPPA

The VPPA provides that "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for the relief provided in" a different subsection.  18 U.S.C. § 2710(b)(1).  The first inquiry thus entails determining whether plaintiffs are "consumer[s] of such provider," within the meaning of the VPPA.  The Act defines "consumer" to "mean[] any renter, purchaser, or subscriber of goods or services from a video tape service provider."  *Id.* § 2710(a)(1).  The parties agree that plaintiffs are neither renters nor purchasers of C-SPAN digital

---

[1]    Defendant also seeks dismissal because "Plaintiffs fail to plausibly allege that C-SPAN disclosed their video viewing information and FID to Meta," Def.'s Mem. at 2, but this argument need not be addressed since the motion is resolved on other grounds.

newsletters or of video content through their MyC-SPAN Accounts, *see* Def.'s Mem. at 7; Pls.' Opp'n at 4, so the inquiry is narrowed to whether plaintiffs are "subscribers" to these C-SPAN services and thereby meet the definition of "consumer" to qualify as an aggrieved person entitled to relief under the VPPA.

Defendant contends that plaintiffs are not subscribers to C-SPAN, notwithstanding their having MyC-SPAN Accounts and signing up to receive digital newsletters. Def.'s Mem. at 7-9. As support, defendant relies on the D.C. Circuit's decision in another VPPA case, affirming a decision of this Court. Def.'s Reply at 2-3 (discussing *Pileggi v. Wash. Newspaper Publ'g Co.*, 146 F.4th 1219 (D.C. Cir. 2025)). A review of the D.C. Circuit's recent opinion provides binding guidance on the VPPA's definition of subscribers, which is dispositive in this case.[2]

The plaintiff in *Pileggi* had enrolled in "the *Washington Examiner*'s email newsletter after she provided it with her name and contact information" and viewed in those newsletters "embedded news videos and hyperlinks to the *Washington Examiner*'s website." *Pileggi*, 146 F.4th at 1225. This plaintiff, "wholly apart from the newsletter," also "independently navigated to the *Washington Examiner*'s website and watched videos there." *Id.* Much like the present case, "the *Washington Examiner*'s website contains the 'Meta Pixel,'" which "transmits information to Meta (Facebook's owner) to help Washington Newspaper target advertisements at Facebook users like Ms. Pileggi." *Id.* The information transmitted includes "which videos a person watched while visiting the website," and "[t]he Meta Pixel also identifies website visitors by matching their IP

---

[2] The Supreme Court has granted certiorari to address a circuit split in authority pertaining to the definition of "consumer" under the VPPA, *see Salazar v. Paramount Glob.*, No. 25-459, 2026 WL 189831 (Jan. 26, 2026) (Mem.), but the parties have not requested a stay pending resolution of that case, and this Court declines *sua sponte* to exercise its "broad discretion to stay a case pending the outcome of proceedings in another forum." *Garcia v. Acosta*, 393 F. Supp. 3d 93, 110 (D.D.C. 2019) (RDM).

addresses and other data to information associated with their Facebook accounts," which, plaintiff contended, gave rise to a VPPA violation. *Id.*

The D.C. Circuit held that the plaintiff was not a subscriber and not a consumer under the VPPA, explaining "five reasons why it is not enough . . . just to obtain some other good or service furnished by a person who also happens to provide videos or audio-visual materials." *Id.* at 1232. Those reasons are: (1) "the statutory text tells us that only a 'consumer' has a cause of action under the Video Privacy Act," *id.*; (2) "'useful clue[s]' in the statute and its structure confirm that to be a 'consumer,' the plaintiff must have obtained a 'video or audio visual service' from the defendant, and not just any good or service," *id.*(alteration in original) (quoting *Dubin v. United States*, 599 U.S. 110, 121 (2023)); (3) "the statute's substantial penalty provision weighs in favor of enforcing the textual linkage between a consumer and a video," *id.* at 1233; (4) "the Video Privacy Act's authorization of punitive damages, 18 U.S.C. § 2710(c)(2)(8), requires that the statutory text be construed against the expansive liability that Ms. Pileggi proposes," *id.*; and (5) "the Video Privacy Act could not effectively serve its purpose of insulating video-viewing records from disclosure if Ms. Pileggi's view prevailed" because "if *any* good or service suffices to make someone a statutorily protected consumer, a video tape service provider would have to determine and differentiate between those who just visit the website and those who visit the website after having at some unknown prior time purchased some different good or service," *id.* at 1233-34 (emphasis in original)). The D.C. Circuit's reasoning illuminates resolution of the instant inquiry whether plaintiffs' actions in signing up for a C-SPAN newsletter or for MyC-SPAN Accounts qualifies them as subscribers to C-SPAN and as consumers under the VPPA.[3]

---

[3] Plaintiffs refer to themselves as "subscribers" to C-SPAN throughout the complaint. *See, e.g.*, Compl. ¶ 59 ("Plaintiff Horan has been a subscriber of C-SPAN since approximately 2018."). Describing themselves as "subscribers" is not dispositive of the legal issue of whether they qualify as "subscribers" under the VPAA. *See*

First, the D.C. Circuit's decision squarely forecloses plaintiffs' VPPA claim to be "consumers" based on signing up for a C-SPAN digital newsletter.[4]  To start, plaintiffs never actually allege that they looked at a C-SPAN digital newsletter and, if so, ever clicked on a video link embedded in the newsletter or watched any such embedded video.  Instead, plaintiffs claim that they "are newsletter subscribers who watched videos on the Website and had their Personal Viewing Information collected and disclosed to Facebook by Defendant."  Compl. ¶ 72; *see also Pileggi*, 146 F.4th at 1237 ("Nor does [plaintiff] claim that she clicked on any website links in the newsletter that took her to the *Washington Examiner*'s website.").  Of course, being able to "watch[] videos on the Website," is available to anyone, not only those users who sign up for C-SPAN digital newsletters or have MyC-SPAN Accounts.  Moreover, plaintiffs do not even allege that the C-SPAN newsletters contain the Meta Pixel code at all.  Compl. ¶¶ 33-35, 58; *see also Pileggi*, 146 F.4th at 1237 ("[Plaintiff] does not allege that any of the videos in the newsletter contained the Meta Pixel that tracks viewing selections.").  As the D.C. Circuit succinctly put the point: "Subscribing to an e-newsletter that includes videos and video links, by itself, is not enough to make someone a 'consumer' under the Video Privacy Act."  *Pileggi*, 146 F.4th at 1237; *see also Carter v. Scripps Networks, LLC*, 670 F. Supp. 3d 90, 99 (S.D.N.Y. 2023) (denying VPPA claim brought by newsletter subscribers because "the Complaint does not include facts that plausibly allege that their status as newsletter subscribers was a condition to accessing the site's videos, or that it enhanced or in any way affected their viewing experience").  Therefore, signing up for a C-SPAN newsletter does not qualify plaintiffs as "subscribers" or "consumers" under the VPPA.

---

*Arpaio*, 797 F.3d at 19; *see also v. Feld Ent. Inc.*, 684 F. Supp. 3d 1056, 1061 (S.D. Cal. 2023) ("[N]ot everything that can conceivably be labeled a 'subscription' automatically triggers the protections of the VPPA.").

[4]    Plaintiffs also make passing mention of "C-SPAN Classroom" but fail to explain what this is or to develop any argument relating that service to their VPPA claim.  *See* Compl. ¶ 1.  Thus, plaintiffs have not established that any relationship with C-SPAN Classroom renders them "consumers" under the VPPA.

Next, plaintiffs' status as MyC-SPAN Account holders likewise does not qualify them as subscribers and consumers under the VPPA. Plaintiffs contend that, as MyC-SPAN Account holders, they "registered, committed to, and expressed association with Defendant's audio/visual services." Pls.' Opp'n at 5-6. Defendant does not seem to contest that plaintiffs registered or expressed association with defendant but instead argues that such association is insufficient to qualify as a "subscriber" or "consumer" under the VPPA. *See* Def.'s Reply at 4-5.

In *Pileggi*, the D.C. Circuit did not "address what kinds of connections are required between a product . . . and a video for a cause of action under the Video Privacy Act to arise," but nonetheless outlined reasoning that proves instructive. 146 F.4th at 1237. When *Pileggi* was before this Court, the ordinary meaning of the word "subscriber" was considered and determined to "require[] a distinct relationship with a video service provider" involving "some type of commitment, relationship, or association (financial or otherwise) between a person and an entity," *Pileggi v. Wash. Newspaper Publ'g Co.*, No. 23-cv-345 (BAH), 2024 WL 324121, at *9 (D.D.C. Jan. 29, 2024) (quoting *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015)), and "a factual nexus or relationship between the subscription provided by the defendant and the defendant's allegedly actionable video content," *id.* (quoting *Tawam v. Feld Ent. Inc.*, 684 F. Supp. 3d 1056, 1061 (S.D. Cal. 2023)). Particularly helpful in this analysis is the Eleventh Circuit's "non-exclusive list of factors indicative of 'subscriber' status: 'payment, registration, commitment, delivery, expressed association, and/or access to restricted content.'" *Id.* (quoting *Ellis*, 803 F.3d at 1256). "The last factor in particular is often viewed as significant by courts." *Goodman v. Hillsdale Coll.*, No. 25-cv-417, 2025 WL 2941542, at *6 (W.D. Mich. Oct. 17, 2025) (collecting cases).

In considering the *Ellis* factors here, no allegation is present that plaintiffs' action in signing up for a MyC-SPAN Account required payment for delivery of any audio visual materials, nor enabled access to any content otherwise restricted from the general public. As to the remaining "commitment" factor, "the court in *Ellis* did not explicitly discuss the type of conduct that would satisfy the commitment factors." *Kuzenski v. Uproxx LLC*, No. 23-cv-945, 2024 WL 5323420, at *3 (C.D. Cal. June 24, 2024). Indeed as to the commitment factor, the Eleventh Circuit found that "downloading an app for free and using it to view content at no cost is not enough to make a user of the app a 'subscriber' under the VPPA, as there is no ongoing commitment or relationship between the user and the entity which owns and operates the app" and that "[i]mportantly, such a user is free to delete the app without consequences whenever he likes, and never access its content again." *Ellis*, 803 F.3d at 1257. This suggests that the commitment factor cannot be satisfied through a *de minimis* exchange of personal information for some access to content. Indeed, at least one court has gone so far, in reliance on "dictionary definitions of 'subscription' contemporaneous with the adoption of the VPPA" to require that "an individual must 'furnish money or its equivalent' to the VTSP [video tape service provider] to qualify as a 'subscriber' within the meaning of the VPPA." *Peterson v. Learfield Commc'ns, LLC*, 705 F. Supp. 3d 937, 958 (D. Neb. 2023). *But see Brown v. Learfield Commc'ns, LLC*, 713 F. Supp. 3d 355, 364 (W.D. Tex. 2024) (rejecting *Peterson*'s monetary-or-equivalent-consideration finding and instead determining that "[t]he ordinary meaning of 'subscribe' accounts for users who sign up *to receive content*, whether or not the consumer pays" (emphasis added)). This Court has already explained that "a monetary payment" is not requisite for recognition as a "subscriber," *Pileggi*, 2024 WL 324121, at *9 (quoting *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 488 (1st Cir. 2016)), but the creation of a "subscriber" relationship must involve some sort of meaningful consideration.

11

The only consideration plaintiffs knowingly conferred was their email address in exchange for several features related to C-SPAN's pre-recorded videos that were otherwise already available to those without MyC-SPAN Accounts. *See also Brown*, 713 F. Supp. 3d at 364 ("Plaintiffs did not allege they got 'any real benefit in exchange' from signing up because the newsletter was not exclusive content." (quoting *Edward v. Learfield Commc'ns, LLC*, 697 F. Supp. 3d 1297, 1306 (N.D. Fla. 2023)). If the provision of an email address were sufficient to establish the commitment factor, then the exchange of any information required for registration would tautologically satisfy commitment, and the factors would functionally merge.

The D.C. Circuit's reasoning highlights why such a *de minimis* exchange of personal information is too minimal to support the commitment factor. The D.C. Circuit observed that the VPPA awards liquidated damages of at least $2,500 for each violation, which "means that a defendant with a website that has 100 visitors who watch five videos apiece would be liable for at least $1.25 million in damages if it disclosed their video choices." *Pileggi*, 146 F.4th at 1233. Therefore, "[t]he statutory text and purpose demonstrate Congress's desire to protect consumers of actual video services with such remedies[, b]ut the stringency of the remedy weighs against judicial expansion of the text to cover harms further removed from commerce in videos or similar audio-visual services." *Id.* The D.C. Circuit also took note of the punitive damages provision within the VPPA, emphasizing that "[l]iability provisions in statutes with civil penalties that punish and deter must be construed narrowly, ensuring fair notice to regulated parties." *Id.* Such substantial penalties, in the form of liquidated and punitive damages, caution in favor of protecting those consumers who have a more substantial relationship with a video service provider, especially where, as here, the video service provider is a "nonprofit corporation" engaging in the valuable service of broadcasting "videos on Congress, the Supreme Court, the White House, key political

events, foreign leader addresses, major issues, . . . [and] educational initiatives" to the public. Compl. ¶¶ 19, 31.

Plaintiffs assert that the parties' behavior satisfies the *Ellis* commitment factor because plaintiffs provided their email and IP addresses to defendant in exchange for "certain unique features related to Defendant's video materials," Pls.' Opp'n at 4, namely, the ability to "create and save clips of C-SPAN video content to their profile page for convenient access; the option to subscribe to email notifications regarding updates on bookmarked video content; access to video recommendations[;] and the ability to download video content," Compl. ¶ 32.  These *de minimis* features do not amount to benefits sufficient to show commitment because they are "the equivalent of adding a particular website to one's Internet browser as a favorite, allowing quicker access to the website's content." *Ellis*, 803 F.3d at 1257; *see Sutton v. TED Found., Inc.*, No. 23-cv-9219, 2024 WL 4167342, at *6 (S.D.N.Y. Sept. 12, 2024) ("Having the ability to download videos is different in kind from having 'special access to certain content' unavailable to non-account-holders." (quoting *Gardner v. MeTV*, 681 F. Supp. 3d 864, 869 (N.D. Ill. 2023))).  Tellingly, like the plaintiff in *Ellis*, plaintiffs were free to cancel their MyC-SPAN Accounts or digital newsletter deliveries at any time for any reason, and faced no consequences for doing so or for never accessing defendant's audio visual materials again.  *See also Carter*, 670 F. Supp. 3d at 99 ("Plaintiffs were free to watch or not watch hgtv.com videos without any type of obligation, no different than any of the other 9.9 million monthly visitors to the site.").  Thus, the commitment factor tilts in favor of defendant.

In sum, while two of the six *Ellis* factors favor plaintiffs—registering for and expressing association with defendant's services—none of the other factors do, including the most important factors since plaintiffs "did not make any commitment or stablish any relationship that would allow

[them] to have access to exclusive or restricted content." *Ellis*, 803 F.3d at 1257. Accordingly, the relationship established between plaintiffs and defendant created by signing up for receipt of digital newsletters and for their MyC-SPAN Accounts does not make plaintiffs "subscribers" of defendant's video content or "consumers" under the VPPA.

**B. Plaintiffs Have Not Established that Defendant Disclosed "Personally Identifiable Information" Under the VPPA**

Assuming as true plaintiffs' allegation that defendant sent data, via Meta Pixel, to Meta, plaintiffs fail to establish that this data constitutes personally identifiable information, providing a second, independent basis requiring dismissal of the complaint.

The VPPA prohibits the knowing disclosure of "personally identifiable information concerning any customer" and defines "personally identifiable information" as "includ[ing] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3), (b)(1). To ascertain whether information is "personally identifiable" within the meaning of the VPPA, the majority of circuits to consider this issue apply the "ordinary person" test. Under this test, "based on the words of the statute, the specific context in which the language is used, and the broader context of the statute as a whole," the VPPA phrase "'personally identifiable information' encompasses information that would allow an ordinary person to identify a consumer's video-watching habits, but not information that only a sophisticated technology company could use to do so." *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 52 (2d Cir. 2025); *see also In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 290 (3d Cir. 2016) ("In our view, personally identifiable information under the Video Privacy Protection Act means the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior."); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) ("The 'ordinary person' test better informs video service

providers of their obligations under the VPPA."). *But see Yershov*, 820 F.3d at 486 (applying different test to interpret meaning of VPAA's "personally identifiable information").

The Second, Third, and Ninth Circuits have persuasively derived this test for personally identifiable information through analysis of the text, the purpose, and the overall context of the VPPA. First, features of the VPPA text suggest that "'personally identifiable information' must include more information than that which, by itself, identifies an individual as having watched certain videos." *Eichenberger*, 876 F.3d at 984. The definition "uses the open-ended word 'includes,' which suggests that the proffered definition describes only one example of 'personally identifiable information,'" and, additionally, "Congress used the word 'identifi*able*.'" the suffix for which means "capable of." *Id.* (emphasis in original) (quoting 18 U.S.C. § 2710(a)(3), and Webster's Third New Int'l Dictionary 4, 1123 (unabr. ed. 1981)). Thus, "the term 'personally identifiable information' covers some information that is 'capable of' identifying a person, as well as information that, standing alone, identifies a person." *Id.*

Second, the context in which Congress enacted the VPPA in 1988 suggests that this statute "serves different purposes, and protects different constituencies, than other, broader privacy laws." *In re Nickelodeon*, 827 F.3d at 288. Indeed, the VPPA was created "following a local weekly newspaper's publication of a profile of then Supreme Court nominee 'Robert H. Bork based on the titles of 146 films his family had rented from a video store,' with the aim '[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials.'" *Pileggi*, 2024 WL 324121, at *1 (alteration in original) (quoting Video Privacy Protection Act of 1988, S. Rep. No. 100-599, at 1, 5 (1988)).[5] The Third Circuit articulated that

---

[5]    "The article that triggered congressional focus on this issue was 'The Bork Tapes' by Michael Dolan, WASH. CITY PAPER (Sept. 25–Oct. 1, 1987), which was intended to highlight the nominee's strict constructionist view that the U.S. Constitution affords no penumbral guarantee of privacy." *Id.* at *1 n.1.

"the legislative history convinces us that Congress's purpose in passing the Video Privacy Protection Act was quite narrow: to prevent disclosures of information that would, with little or no extra effort, permit an ordinary recipient to identify a particular person's video-watching habits." *In re Nickelodeon*, 827 F.3d at 284. The Ninth Circuit employed an example to illuminate the obvious limits of the Act when passed: "The manager of a video rental store in Los Angeles understood that if he or she disclosed the name and address of a customer—along with a list of the videos that the customer had viewed—the recipient of that information could identify the customer[, but] it was clear that, if the disclosure were that 'a local high school teacher' had rented a particular movie, the manager would not have violated the statute." *Eichenberger*, 876 F.3d at 985; *see also In re Nickelodeon*, 827 F.3d at 290 ("The classic example will always be a video clerk leaking an individual customer's video rental history.").

That overall purpose is reflected in the structure of the statue, which penalizes the knowing disclosure of personally identifiable information, "views disclosure from the perspective of the disclosing party," and "looks to what information a video service provider discloses, not to what the recipient of that information decided to do with it." *Eichenberger*, 876 F.3d at 985. For this reason, the Second Circuit assessed that "[i]t does not make sense that a video tape service provider's liability would turn on circumstances outside of its control and the level of sophistication of the third party." *Solomon*, 136 F.4th at 52. Limiting the potential liability in this manner also prevents "impermissibly broadening [the Act's] scope to include the disclosure of technological data to sophisticated third parties." *Id.*

Third, the VPPA was crafted for "[p]re-Internet users [who] obtained a physical object when they purchased or rented a video cassette tape," a wholly different situation than "modern audiences [who] click on a link and receive a stream of ones and zeroes in response." *Pileggi*, 146

F.4th at 1239 (Randolph, J., concurring).  Indeed, "[t]he Internet was in its infancy in 1988, and Congress would have needed remarkable oracular powers to have included language about online videos in the VPPA."  *Id.*; *see also In re Nickelodeon*, 827 F.3d at 284 ("We do not think that, when Congress passed the Act, it intended for the law to cover factual circumstances far removed from those that motivated its passage.").  Then, in 2013, when amending the VPPA "in recognition that 'the Internet ha[d] revolutionized the way that American consumers rent and watch movies and television programs,'" Congress "declined to amend the definition of personally identifiable information, even in the face of testimony asking for an expansion of the definition to include IP addresses."  *Solomon*, 136 F.4th at 53 (alteration in original) (quoting S. Rep. No. 112-258, at 2 (2012)).  The personally identifiable information provision in the VPPA stands unaltered compared to "later privacy statutes that included a more expansive definition of personally identifiable information or related terms."  *Id.*  The Third Circuit highlighted the dangers of extending application of the VPPA too far in the Internet era, finding that the IP address by itself does not constitute personally identifiable information in part because "the use of third-party cookies on any website that stream video content [would be] presumptively illegal."  *In re Nickelodeon*, 827 F.3d at 290.

In the face of this authority, plaintiffs seek application of the First Circuit's test, which was articulated before the decisions of the Second, Third, and Ninth Circuits and therefore without the benefit of the reasoning presented in those decisions.  *See* Pls.' Opp'n at 9-15.  The First Circuit's earliest-articulated test asks whether the information disclosed was "reasonably and foreseeably likely to reveal which" prerecorded video content a plaintiff had viewed.  *Yershov*, 820 F.3d at 486 (reversing the district court's grant of a motion to dismiss on the basis that defendant was a consumer under the VPPA).  Acknowledging that "[t]he statutory term 'personally identifiable

information' is awkward and unclear," the First Circuit observed that "[t]he definition of that term . . . adds little clarity beyond training our focus on the question whether the information identifies the person who obtained the video." *Id.* Nevertheless, "the language Congress did use to define [personally identifiable information] begins with the word 'includes,'" which "normally implies that the proffered definition falls short of capturing the whole meaning." *Id.* Plaintiffs argue, without much explanation, that this "standard is the better reasoned approach and more consistent with the VPPA's plain language." Pls.' Opp'n at 11. The First Circuit has not had occasion to revisit the *Yershov* decision since the consensus in favor of the ordinary-person test has emerged among the courts of appeals and, in any event, since the D.C. Circuit has issued no binding precedent on this issue, the robust reasoning of the other courts of appeals persuades that the ordinary-person test should be utilized here.

Plaintiffs allege that defendant's website sends Facebook "various querystring parameters and cookie values which disclose the name of the videos watched by the consumer, the URLs of the webpages hosting the videos, and the consumer's FID, among other information." Compl. ¶ 44. Plaintiffs sufficiently explain how an ordinary person might be able to use an FID to identify an individual's Facebook account, *see, e.g.*, Compl. ¶ 37, but neither describe or allege that an ordinary person is able to extract the FID and viewing activity from these querystring parameters and cookie values. That missing link is vital. Indeed, in a recent decision by the Second Circuit in a VPPA case, inspection of an "exemplar screenshot" reproduced in the complaint depicting the Meta Pixel's transmittal led that court to conclude that: (1) "[i]t is implausible that an ordinary person would look at the phrase 'title%22%3A%22-%E2%96%B7%20The%20Roast%20of%-20Ric%20Flair'—particularly if the highlighting in Box A is removed—and understand it to be a video title"; (2) "[i]t is also implausible that an ordinary person would understand, 'with little or

no extra effort,' the highlighted portion to be a video title as opposed to any of the other combinations of words within the code, such as, for example, '%9C%93%20In%20the%20last%20weekend%20of%20-July%2C'; and (3) "it is not plausible that an ordinary person, without the annotation of Box B, would see the 'c_user' phrase on FITE's servers and conclude that the phrase was a person's FID." *Solomon*, 136 F.4th at 54. Thus, the Second Circuit determined that the appellant had "failed to plausibly allege that FITE disclosed 'personally identifiable information' in violation of the VPPA." *Id.* at 55.

In contrast to the Second Circuit case, the instant complaint provides no excerpt from the code transmitted through the Meta Pixel nor any indication of how an ordinary person would disentangle and identify personally identifiable information from the "various querystring parameters and cookie values." Compl. ¶ 44. That "[t]he transmitted data permits Facebook to identify the specific videos that an individual has watched," *id.*, is of no avail because Facebook does not represent an ordinary person. Without an explanation for, or even an allegation that, an ordinary person would be able to decipher the querystring parameters sent by the Meta Pixel, plaintiffs have failed to establish that defendant disclosed personally identifiable information.

## IV.    CONCLUSION

For the foregoing reasons, defendant's motion to dismiss the complaint is granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), because plaintiffs fail to state a cognizable claim under the VPPA. An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: March 9, 2026

_____
**BERYL A. HOWELL**
United States District Judge